[Civ. No. 22473.   First Dist., Div. One.   Dec. 10, 1965.]

EVERETT MILLER, Plaintiff and Respondent, v. MOUN-
TAIN VIEW SAVINGS AND LOAN ASSOCIATION,
Defendant and Appellant.

Eustice & Feeley and W. Gordon Eustice for Defendant and Appellant.

Arvin O. Robb for Plaintiff and Respondent.

SIMS, J.—Defendant Mountain View Savings and Loan Association has appealed from a judgment awarding plaintiff the sum of $5,450, and interest, for plumbing material and labor furnished at the request of defendant owner to five lots on which appellant granted secured loans which were foreclosed by sales under the deeds of trust. The owner defaulted and has not appealed from the adverse judgment against him.

Appellant attacks the findings of fact and conclusions of law of the trial court insofar as they tend to support the right of respondent to recover. The issues raised are whether or not respondent subcontractor obtained a right to reimbursement from the lender by reason of an unbonded stop notice filed under the provisions of section 1190.1 of the Code of Civil Procedure; whether or not he acquired any such right by reason of an equitable lien, and the effect, if any, either on the foregoing claims or independently, of the fact that appellant after buying the property resold it at a substantial profit which more than encompassed the sum sought by respondent. It is conceded that any interest in the real property itself, which respondent might otherwise have acquired by reason of recording a mechanic's lien, was extinguished by the sale under the prior deed of trust held by appellant.

The trial court found that the defendant White and his wife on April 19, 1963, were the owners of the five lots to which the labor and material were subsequently furnished by respondent. The evidence reflects that appellant conveyed the premises to the Whites by deed dated April 19, 1963, and recorded on April 29th. Of the $9,500 purchase price received for each lot, $5,900 was credited to the purchasers from the proceeds of notes secured by deeds of trust executed by the Whites and recorded at the same time as the deed.

The findings set forth that on April 19th the Whites entered into a building and loan agreement with appellant as to each separate lot, pursuant to which appellant agreed to loan $39,000 on each of four lots, and $39,500 on a fifth lot; that the agreements provided for five progressive payments for the construction on each of the lots of a four-unit apartment house with carports, and that "The payments from the loan were for the sole benefit of labor and materials rendered and furnished in the construction of these respective units." Reference to the agreements reveals that each provides for a $5,900 payment to be paid upon recordation, and for the payment of a loan fee, trustee fee, and tax lien service fee to be paid by deduction from the loan proceeds.

The loan agreements provide that the loan proceeds are to be deposited with and assigned to the lender as further security, and that they are to be paid out in accordance with the agreement for the construction of the improvements. Interest payable is limited to that on funds actually disbursed for the first 90 days, then subsequently becomes payable on the full amount retroactively to the date of the agreement. The right to credit undisbursed funds on the indebtedness in the event of any default is expressly reserved to the lender.

Appellant's records reflect that on April 22, 1963, an "Incomplete Loan" account was set up for each lot by crediting the account with the principal sum of the loan. At the same time each account was charged with the sum of $5,900, which was applied to the purchase price as set forth above. On April 30th, each account was charged with interest for April (for one-half month on $5,900 at 6¾ per cent), and the respective amounts set forth in the applicable agreement for loan fee, trustee fee, and tax lien service fee, which aggregated $1,581 for each of the first four lots and $1,601 for the fifth. On May 31st, each account was charged with one month's interest at 6¾ per cent on the sums thereofore advanced. On June 28th, each account was again charged with one month's interest at 6¾ per cent on the sums previously

advanced; and, in the case of the first four lots, a progress payment was made in the sum of $4,937.83 which represented the difference between the payment called for, $6,620, and the charges previously made to the account as outlined above. In the case of the fifth lot, the progress payment was made July 11, 1963, in the sum of $5,017.60, representing the difference between $6,720, as called for, and said charges. The findings of the court recite that the full amount of these progress payments was disbursed for construction purposes, but no issue is made of this discrepancy by appellant.

The findings of fact recite: "Plaintiff, in reliance upon the building and loan fund, and pursuant to a contract with the defendant Larry White, installed basic plumbing material and labor for the construction of the housing units on each specific lot." Appellant objects to so much of the foregoing as states: "in reliance upon the building and loan fund." The evidence on this point is hereinafter reviewed.

The court found that respondent continued to work on the project until July 29, 1963, at which time he had completed, pursuant to the terms of his contract, the rough plumbing and part of the "top out" to the extent of a reasonable value of $1,907.50 for each unit; and that he had been paid $1,362.50 on account for each of three units. The court also found that the construction of the uncompleted improvements ceased on or about July 23, 1963. Respondent completed the rough plumbing and sent bills for 50 per cent of the contract price on July 24th. After the complete cessation of work on the project he estimated the additional work and materials furnished by him, which did not reach the "top out" stage, as 20 per cent of the contract price, and on August 9th prepared and submitted new bills for the total balance then due, with credit for the payments received. He was unable to state with any accuracy when the last work was done by him, but the court's finding of July 29th falls within the limits of his testimony although it is inconsistent with the general finding that work ceased July 23d. Respondent admitted that about one year later he was charging about $600 more than he would have earned on completion of the original contract, to complete each of the jobs for a new owner, and explained that vandalism had caused more work and that his cost of doing business had increased.

Following the discovery on July 23, 1963, that no work was in progress, appellant, on July 24th, charged each of the "Incomplete Loan" accounts with the unexpended loan bal-

ance, which in each case was a sum equal to the total of the undisbursed four out of the five projected construction progress payments.[1] On July 29, 1963, appellant caused to be recorded Notices of Default which had been executed under date of July 24, 1963, for each loan. Each of these notices recited that the alleged breach was: "The failure upon the part of the trustor and/or his duly authorized agent to apply funds toward construction of the proposed improvement." The court expressly found that no evidence was adduced to support this recital, and that although work had ceased on all of the five jobs, the period of cessation of work had not violated the terms of the construction loan agreement ("ten (10) calendar days") at the time the notice of default was recorded.

The findings reflect that on July 30, 1963, respondent caused to be served upon appellant a stop notice pursuant to "Section 1190.1(c) C.C.P." which was received by it on August 2, 1963, by certified mail; and that this notice was not accompanied by a bond. Appellant questions the former finding, insofar as it implies compliance with law, because of the failure to accompany the notice with a bond. Thereafter, on August 21, 1963, respondent recorded a "Mechanics' Lien" for the work, labor and services so performed.[2] The court expressly found that said lien was nullified by the subsequent foreclosure of the deeds of trust by appellant, and that the legal rights of respondent terminated by merger of the equitable and legal title in appellant. No other claims were made against appellant by any other person or claimant performing work, labor and services upon the property involved.

The court found that the property was thereafter (March 12, 1964, as evidenced by deeds dated that day and recorded March 24, 1964) sold by the trustee under the deed of trust to appellant for an aggregate sum of $65,434.38,[3] which repre-

---

[1]It is not contended that the stage of construction for the second progress payment has been attained. Admittedly the plumbing had only been completed up through the second story and the completion of the "top out" was precluded by the failure to complete the roof. Appellant's inspection on July 23d reflected little work had been accomplished after the earlier completion of the first stage.

[2]The recorded claim of lien recited a total sum due of $9,537.50, which represented 70 percent of the total contract price on the five units without credit for the payments admittedly received on three of them. Appellant conceded that this was an innocent error and does not attack the recorded notice on this score. (See Code Civ. Proc., § 1196.1.)

[3]The total of the figures from the evidence is $65,464.38, respondent alluded to it as $65,394.38; the figures in the findings actually add up to $65,455.38, but, when allowance is made for a transposition, do accord

sented the total amounts which appellant claimed it had expended "pursuant to their note obligation and deed of trust" on each of the five lots; and that "immediately thereafter"[4] appellant sold the property to a third party for $76,300 and received a profit in the sum of $10,865.62.

Appellant offered requests for express findings pursuant to the provisions of section 634 of the Code of Civil Procedure. In addition to covering some of the discrepancies and the objections noted above, appellant complains of the failure to set forth the date on which suit was filed to enforce respondent's lien rights. The record reveals that the complaint was filed August 26, 1963, and no express finding is required on this point. Appellant's answer was filed January 28, 1964.

From the foregoing facts the trial court concluded that respondent had an equitable lien upon the construction funds which precluded appellant from crediting back the balance of the loan account in disregard of the amount of his claim;[5] and that respondent was entitled to judgment against appellant for the amount of his claim together with interest from July 27, 1963, at the legal rate "from surplus funds held by" appellant, together with costs and disbursements. Judgment was unconditionally rendered against appellant and White. Appellant challenges all of the foregoing conclusions.

with the true figure. The error in the use of the figure set forth above is carried forward in a $30 error in appellant's alleged profit.

[4] No inference of collusion or fraud in connection with the bid on the public sale should be drawn from the use of the phrase "immediately thereafter." Appellant objected and objects to all evidence of the subsequent sale. The evidence fails to show just when the lots were resold, but reflects that considerable time and effort was expended by appellant in attempting to dispose of the lots. Appellant requested a finding and asserts in its brief that this sale was May 4, 1964, almost two months after the foreclosure.

[5] The conclusions read in part as follows: "That by reason of the work, labor, services and materials performed by plaintiff, plaintiff acquired an equitable lien against the construction funds, which was perfected by proper filing of Mechanic's lien within the time prescribed by law, and by filing with the defendant Mountain View Savings and Loan Association, a stop notice in accordance with Section 1190.1 (h) CCP. That plaintiff performed the work, labor and services and furnished the materials in reliance upon the construction funds, and became entitled to an equitable lien on all construction funds which were in excess of the prior lien of the lender, defendant Mountain View Savings and Loan Association. This equitable lien continued in existence and created defendant Mountain View Savings and Loan Association, a trustee of said portion of the construction loan fund up to the total amount claimed by plaintiff in his complaint. Any action of the defendant Mountain View Savings and Loan Association closing this account or attempting to credit the entire balance funds of the note is void and of no effect insofar as it ignores the existence of the equitable lien of plaintiff."

Respondent, in support of the conclusions and judgment of the trial court, asserts that the service on appellant of a notice, which otherwise complied with the provisions of subdivision (h) of section 1190.1 of the Code of Civil Procedure,[6] created a lien against construction funds which the lender had not disbursed to the owner, despite the fact that such notice was not accompanied by a bond.

Respondent predicates his interest in the funds on the language which recites, ''whereupon the person so given such notice under this subsection *may withhold funds* to answer such claims and any lien that may be filed therefor, but shall be under no obligation to do so unless a bond is furnished as hereinafter provided.'' (Italics added.) He acknowledges that there is a distinction between the permissive withholding so authorized, and the mandatory withholding required by the provisions of the second paragraph of subdivision (h) when a bond is filed. He apparently contends that although the

[6]Code of Civil Procedure, section 1190.1, subdivision (h), at all times material herein provided and now provides: ''Any of the persons mentioned in Sections 1181 and 1184.1, except the contractor at any time prior to the expiration of the period within which claims of lien must be filed for record, as prescribed by the provisions of Section 1193.1 of this code, may, in any instance in which the funds with which the cost of the work of improvements are, wholly or in part, to be defrayed from the proceeds of a building loan, give to the mortgagee, beneficiary under deed of trust, or assignee or successor in interest of either, or to any escrow holder or other party holding any funds furnished or to be furnished by the owner or lender or any other person as a fund from which to pay construction costs or arising out of a construction or building loan, a notice similar to the one provided for in subdivision (a) of this section, whereupon the person so given such notice under this subsection may withhold funds to answer such claims and any lien that may be filed therefor, but shall be under no obligation to do so unless a bond is furnished as hereinafter provided.

''If such person entitled to file such a claim under this subsection files with the person holding such funds as a fund from which to pay such construction costs, a bond with good and sufficient sureties in a penal sum equal to one and one-quarter times the amount of such claim, undertaking that if the defendant recovers judgment in an action brought on said verified claim or on the lien filed by the claimant, the lien claimant will pay all costs that may be awarded against the owner, contractor, or person holding such funds, or any of them, and all damages that such owner, contractor, or person holding such funds may sustain by reason of the equitable garnishment effected by the claim or by reason of the lien, not exceeding the sum specified in the undertaking, then the person holding such funds must withhold from the borrower or other person to whom said owner may be obligated to make payments or advancements out of said fund sufficient money to answer such claim, and any lien that may be filed therefor. No assignment by the owner or contractor of construction loan funds, whether made before a verified claim is filed, or after such claim is filed shall be held to take priority over claims filed under this subsection (h) and such assignment shall have no binding force insofar as the rights of claimants who file claims hereunder are concerned.''

mandatory provisions require a bond where the withholding is to be "from the borrower or other person to whom said owner may be obligated to make payments or advancements out of said fund," no such bond is required to defeat a claim made by the lender itself for reimbursement from the construction loan fund because such claim is derived from an assignment prohibited by the provisions contained in the last sentence of subdivision (h).

Appellant points to the express language first quoted, and the provisions of subdivision (m) of section 1190.1, which require a corporate surety bond if the fundholder objects to the sureties on the bond first furnished by the claimant, and which further provide that on failure to furnish such bond, "the party served with such verified claim or notice to withhold may disregard the same and release all funds withheld in response thereto." It contends that no rights at all can be created by an unbonded notice.

Before examining the authorities which have construed the statutory provisions in question it is necessary to dispose of several procedural objections raised by appellant. It claims that the notice and the action predicated thereon were each filed prematurely.

Subdivision (h) of section 1190.1 refers to "at any time prior to the expiration of the period within which claims of lien must be filed for record," as the time within which any person entitled to assert a mechanic's lien may give notice of claim to the holder of the funds. The notice may be given not only for labor performed or materials furnished, or both, but also for labor or materials, or both, which the claimant has agreed to perform or furnish. (Code Civ. Proc. § 1190.1, subd. (a).) ▪ Therefore the notice may be given at any time after such agreement has been executed (see comment, *California Mechanics' Liens* (1963) 51 Cal.L.Rev. 331 at p. 352), and was not given prematurely in this case.

Section 1197.1 of the Code of Civil Procedure expressly provides that no action shall be commenced to enforce the payment of a claim for which a notice has been given under section 1190.1, "prior to the expiration of the period within which claims of lien must be filed for record, as prescribed by Section 1193.1 of this code." (See *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.* (1964) 61 Cal.2d 728, 736 [40 Cal.Rptr. 85, 394 P.2d 829].) The time referred to is also the expiration of the time within which notice of claim may be given under subdivision (h) of section 1190.1. ▪ Under

the circumstances of this case the period within which claims of lien could have been filed for record or further notices could have been given to appellant under subdivision (h), could not have expired on August 26th when suit was filed, and presumably did not expire until 150 days after the cessation of labor on the construction, be it July 23d or July 29th. (Code Civ. Proc., § 1193.1, subd. (g) ; see 51 Cal.L.Rev., *supra,* at p. 384.) The action was therefore premature as an action to enforce rights on the stop-notice claim.

In this case respondent also recorded a claim of lien. It was properly recorded by him, as a subcontractor, on August 21st after he had ceased to perform his labor and to furnish materials (Code Civ. Proc., § 1193.1, subd. (a)), and before the expiration of the period within which such claims of lien could be filed for record as noted above. (See also 32 Cal. Jur.2d, Mechanics' Liens § 64, pp. 670-671.) He was required to bring proceedings to enforce such rights as he may have secured by his recorded claim of lien within 90 days after it was recorded. (Code Civ. Proc., § 1198.1.) The action was therefore properly filed on this phase of the case.

Respondent's complaint referred both to the notice of claim allegedly served under the provisions of section 1190.1, subdivision (h), and to the recorded claim of lien. He prayed for personal judgment against the owners, for judgment against appellant for any moneys due the owners "under and pursuant to the terms of any and all construction agreements and loans pertaining to the real property described in the complaint," and for foreclosure of his mechanic's lien and a deficiency judgment against the owners. Appellant did not answer until January 28, 1964, 153 days after the complaint was filed. So far as appears from the record it filed no demurrer or plea in abatement. In its answer it admitted ownership of the property by the Whites; that it had entered into a construction loan agreement with them; and that it had received a notice without bond. No reference was made to the premature filing of the suit or to any other lien or stop-notice claims. The trial court, as already noted, found no other claim was made against appellant.

The matter is controlled by the rule set forth by this court in *County of San Mateo* v. *Bartole* (1960) 184 Cal.App.2d 422, at page 430 [7 Cal.Rptr. 569], as follows: "It has long been established in this state that the defense that an action is prematurely brought is a matter of abatement which must be pleaded in proper time or it is waived. Moreover, after this

defect has ceased to exist, it cannot be interposed for the first time.''

The final contention of appellant leads to a return to an analysis of the precedents construing subdivision (h) of section 1190.1, which was deferred for consideration of the procedural points. It is contended that since the notice of claim was received after the loan balance already had been applied to reduce the amount otherwise due on the note, there was no fund to which the notice, even if valid, could apply. Respondent, as stated above, argues that such a charge-back whether before or after the claim is filed is an assignment prohibited by the statute.

In general it is stated: ''The statute is remedial and must be liberally construed to effect its objects and to promote justice. [Citations.] It is designed to protect mechanics and materialmen who furnish labor and materials that go to enhance the value of the owner's property, an enhancement to be paid for out of the building fund. That this enhancement in value also increases the security of the lender, must not be overlooked.'' (*Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn.* (1963) 221 Cal.App.2d 705, 709 [34 Cal. Rptr. 644] ; and see *H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn.* (1964) 226 Cal.App.2d 24, 27-28 [37 Cal.Rptr. 775] ; and *Korherr* v. *Bumb* (9th Cir. 1958) 262 F.2d 157, 162.) ■■ The right to recover under a notice given pursuant to section 1190.1 is independent of and cumulative with any right arising by reason of recording a claim of lien. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.*, *supra*, 61 Cal.2d 728, 732; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn.*, *supra*, 221 Cal.App.2d 705, 708; *Calhoun* v. *Huntington Park First Sav. & Loan Assn.* (1960) 186 Cal.App.2d 451, 459 [9 Cal.Rptr. 479] ; *Korherr* v. *Bumb*, *supra*, 262 F.2d 157, 160.) ■■ It is not necessary to record a claim of lien to perfect rights under a valid stop-notice claim (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.*, *supra*) ; nor does the fact that a claimant's mechanic's lien is wiped out by a foreclosure of a prior deed of trust defeat his rights under the stop notice. (*Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn. supra.*) ■■ For the purposes of the provisions of section 1181 as incorporated into subdivision (h) of section 1190.1, where an owner undertakes construction on his own behalf, those who contract with him for portions of the work are subcontractors and are not precluded from the benefits of the latter statute because there is no

intervening prime contractor. (*Korherr* v. *Bumb, supra,* 262 F.2d 157, 161-162.)

Where a bonded stop notice is given, ''Subsection (h) requires that funds earmarked for construction purposes be used to pay suppliers of labor and materials who file claims under the subsection and therefore supersedes the private arrangements of borrower and lender.'' (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 734 and see *H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn., supra,* 226 Cal.App.2d 24, 27; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn., supra,* 221 Cal.App.2d 705, 710; *Calhoun* v. *Huntington Park First Sav. & Loan Assn., supra,* 186 Cal.App.2d 451, 459-460.) ▆ Although the statute itself refers to the bonded claim as effecting an ''equitable garnishment,'' the efficacy of the notice is not dependent on whether or not there is money payable to the borrower. ''The requirement that the fundholder withhold claimed funds applies not only when his contract calls for payment but even when it does not.'' (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 732-735, at p. 734; and see *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn, supra,* 221 Cal.App.2d 705, 708.) Therefore although construction was not completed, and no further work was done after the fourth of five progress payments was made, the lender-fundholder cannot assert the owner-borrower's default (which could properly be asserted against him to defeat demand for the fifth and final payment) against the stop-notice claimants; nor can it assert its rights under the loan agreement to use the balance of the construction loan funds to either reduce the indebtedness or to complete the buildings. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra.*) Similarly where the lender-fundholder ignored the notices to withhold and used substantially all of the undistributed construction loan funds to complete the construction, as it was authorized to do by the loan agreement with the defaulting owner-borrower, the bonded stop-notice claimants may recover from the lender the amount of their claims which were less than the loan balance on hand when notice was given before the lender made such disbursements. (*H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn., supra.*) *Rossman, supra,* also rejects the right of the lender-fundholder to set up the default of the owner-borrower and holds it personally liable for the amount claimed in the bonded stop notice, when, in disregard of that notice, the loan balance was thereafter credited against the indebted-

ness. In that case the deed of trust was, as here, extinguished by sale for the amount of the adjusted indebtedness. In *Calhoun, supra,* similar conclusions resulted where the lender-fundholder transferred the unexpended construction loan balance to a creditor's committee despite plaintiff's bonded claim.

Appellant asserts that in the foregoing cases the lenders' right to reimbursement had not been asserted prior to the receipt of the stop notice; whereas in this case it had charged back the unexpended balance and had recorded notices of default under the deeds of trust before the receipt of the stop notice. In *A-1 Door, supra,* the court points out: "The owners assigned the funds to defendant as security for their obligation to repay the loans and for any of their other obligations to defendant. [Fn. omitted.] Defendant agreed to disburse the funds according to a progress payment schedule. Thus defendant's possession of the funds and its defense to the stop-notice claims based on its asserted right to continued possession of the funds depend entirely on assignments invalidated by the terms of subsection (h)." (61 Cal.2d at p. 735; and see *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn.,* 221 Cal.App.2d at p. 710.) The statutory provisions invalidate as to a claimant an assignment whether made before or after a verified claim is filed. Assertion of the lender's rights by virtue of his contract with the borrower must await the running of the period in which claims may be filed, and then yield priority to such claims as are filed.

In all of the cases referred to the claims were supported by bonds, except for one claim in *H. O. Bragg.* The court in that case, where the funds had been used to complete the construction, permitted recovery by that claimant because the lender was estopped to deny the claim since it had assured the claimant it would be paid, and the claimant relied on those assurances to its prejudice by not perfecting the other remedies available to it. Certainly if the unbonded claim was sufficient to defeat the lender's right to complete the construction it would not have been necessary to establish estoppel for recovery.

The cases which have been referred to all meticulously note the statutory requirement of a bond and point out that one has been filed with each recognized claim. The text writers and commentators uniformly indicate that there is no obligation on the holder of a construction fund to withhold unless a bond is furnished as prescribed by the statute. (32 Cal.Jur.

2d, Mechanics' Liens, §§ 53 and 59, pp. 662 and 666; Ilyin, *Stop Notice! — Construction Loan Officer's Nightmare,* 16 Hastings L.J. (1964) 187, 189-190; Comment, 51 Cal.L.Rev., *supra,* 331, 334; Hunt, *The Stop Notice Remedy in California,* 38 L.A. Bar Bulletin (1962) 16, 19; and see Note, 12 U.C.L.A. L.Rev. (1965) 1246, *passim.*)

█ The bond is to protect the interests of "the owner, contractor, or person holding such funds" ("funds furnished or to be furnished by the owner or lender or any other person as a fund from which to pay construction costs or arising out of a construction or building loan"). (Code Civ. Proc., § 1190.1, subd. (h).) The statute is singularly silent as to the interest of the lender. It may be assumed that his interest is derived from and similar to that of the owner, in that each intends that the value of the property will be enhanced by the construction of the improvements without dissipation of the moneys provided for the same. In the instant case, it can be asserted that the time within which claims can be filed has expired, that the resale of the property demonstrates that respondent's claim could be added to the previous outlays from the loan account without rendering the security inadequate, and that a bond would have served no useful purpose.

█ This determination, however it may affect any rights to an equitable lien, cannot ex post facto affect the rights arising at the time the notice of claim was filed. It is conceivable that the owner may have appeared the next day, sought to relieve his default, and contested respondent's right to the 70 per cent completion he asserted on each unit. Under the statute, in the absence of a bond, there would be no duty to withhold from the owner under such circumstances. If there is no obligation to withhold, the fundholder as lender should not be precluded from reducing, rather than increasing, the amount of indebtedness which the owner or any lienholder claiming under him, including respondent, would have to pay to relieve the default after notice of breach and election to sell.

On the one hand, there are strong reasons of policy to require the commercial lenders to police the speculative building industry by penalizing the lender if the project fails. The construction loan substitutes the lender's promised money for the real property which his prior deed of trust generally renders inadequate for any realistic relief. Claimants by lien recorded against the owner's equity, which is probably further encumbered with a subordinated deed of trust for a portion of the purchase price, may find no value left to sell. It leaves open to the lender protection through the requirement of a

completion bond. (See Code Civ. Proc., §§ 1185.1 and 1190.1, subd. (j) ; and *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 735.) It is also suggested that the lender, in addition to inspecting physical progress of the work, call for receipted bills, or issue joint checks and use other fiscal controls to insure that payments are properly applied. (See *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn., supra,* 221 Cal.App.2d 705, 710; and Note, 12 U.C.L.A. L. Rev., *supra,* 1246, 1252-1253.)

On the other hand, it is asserted that by permitting the claimants to reach loan funds which it was contemplated would not be advanced until a further stage of construction, the risk of the project has been shifted from the owner to the construction lender. It is acknowledged that there is justification in permitting the claimant to recover for the increased value that he contributed to the property in that it enhanced the security of the lender, but it is claimed that as a practical matter the partially completed project is not enhanced in value commensurate with the supplies and labor incorporated in it.[7] Difficulties in policing under any of the suggested methods are stated to be a reason for not shifting the risk from the owner and the contractors, suppliers and subcontractors working with him, to the depositors and investors whose funds are involved. It is suggested that liability be limited to funds which would be due the builder-developer according to the stage of completion. (Ilyin, *op. cit.,* 16 Hastings L.J., 187, 191-194.)

In *A-1 Door, supra,* the court relies on *Stettin* v. *Wilson* (1917) 175 Cal. 423 [166 P. 6], for the proposition that the stop-notice claimants' rights are not limited to the rights the owner-borrower might have against the lender-fundholder, or, conversely that the default of the owner-borrower, a defense

---

[7]For example, in the instant case, work which was originally to be done for $2,725 per unit was partially done to a claimed value of $1,907.50 per unit, leaving $817.50 as the cost to complete in orderly fashion under the contract. The actual cost to complete was $1,476 for four units and $1,625 for the fifth. Hindsight would indicate that only $1,249 was contributed to the value of four units and $1,100 to the fifth. If it be assumed that on resale in 1964 the lots themselves were worth the same price of $9,500 each for which they were sold in 1963 the total land value would be $47,500. Of the total resale price of $76,300, $28,800 could be attributed to the partially constructed improvements. The expenditures, exclusive of those for land and financing charges, amount to $24,768.92 paid out by the lender at the first stage of construction and the unpaid claim of respondent for $5,450, or a total of $30,218.92 unexpended and incurred for improvements. To this sum would have to be added sums, if any, expended by the owner.

against him, cannot be asserted against the stop-notice claimants to defeat payments which would otherwise be due. In *Stettin* the court stated: "Next, respondents contend that because the original contractors abandoned their contract nothing was or could become due to them. However that may be, as a matter of general law in an action after abandonment by the original contractor against the owner—for the purposes of all subordinate to the original contractor the mechanic's lien law itself fixes and declares the law and in terms says that in case of abandonment the difference between the sum paid to the contractor and the value of work and material which the contractor has furnished and for which the owner has not paid shall be treated as the fund available to the lien claimants. (*Diamond Match Co.* v. *Silberstein, supra,* [(1913) 165 Cal. 282, 286-288 (131 P. 874)].)'' (175 Cal. at p. 426.) By analogy the fund available to the stop-notice claimants against a loan fund would be the difference between the sums properly advanced and paid out of the loan account, and the total value of the work and material furnished toward the improvement whether to a prime contractor or the owner. The balance of the loan fund would be credited against the indebtedness, and the lien claimants and other subordinate security holders would have a greater equity against which to enforce their claims. In *A-1 Door,* the claimants who followed the ordinary lien path are subordinated to the stop-notice claimants who ride to priority on the coat tail of the lender's deed of trust. Although the race should go to the vigilant, they should not at the end of the race receive a bonus insofar as sums are paid out and charged against the property in excess of the difference between the total value of the work furnished, and the sums properly paid out on the loan. To pay out any such excess and charge it to the first lien, not only forces the lender to advance more than the value he received but also discriminates against the junior lienholders who may include claimants who also contributed to the value of the property.

The decisions, however, have not demonstrated concern for the investors or depositors and the statutory loan limitations required for their protection. (See *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 735; and *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn., supra,* 221 Cal.App.2d 705, 710-711; and cf. Fin. Code, § 7156.) It is also noted that where the owner undertakes improvements and subjects his property to lien claims, the liens against the property in the absence of recording the

contract and a completion bond (Code Civ. Proc., § 1185.1), may make the owners' outlay exceed the contemplated price if the contractor fails to pay labor and materialmen after he is paid. (See Comment, 51 Cal.L.Rev., *supra*, 331, 339-341.)

On the balance, considerations of policy may indicate that the nonbonded claimant should be entitled to protection to the same extent as the bonded claimant. ■ The statutory remedy provided by subdivision (h) is, however, in derogation of the generally acknowledged right of the lender to contract for a lien which is superior to the rights of lien claimants in the property. If his rights are to be cut down, and he is in effect required to make a forced advance, it must be done in the manner provided by statute and a bond should be furnished. Under earlier statutory provisions it was recognized that where withholding by the owner was not mandatory but only permissive, he could not be held accountable for failure to withhold. (*Hubbard* v. *Jurian* (1917) 35 Cal.App. 757, 761-763 [170 P. 1093]; *Horlein* v. *Bohlig* (1918) 37 Cal.App. 646, 648 [174 P. 697]; and see *San Mateo Planing Mill Co.* v. *Davenport Realty Co.* (1933) 218 Cal. 702, 712 [24 P.2d 787].) It is concluded that respondent's failure to file a bond precludes him from seeking relief under the statute.

In support of the judgment respondent also relies upon principles which have been applied in cases involving the disposition of loan funds remaining after the completion of the improvement. Where the lender has expressly or impliedly agreed to pay a claim, the claimant furnishing the services of materials is entitled to recover his claim from the lender, at least to the extent that funds were available at that time. (*San Mateo Planing Mill Co.* v. *Davenport Realty Co., supra,* 218 Cal. 702, 708; and see *H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn., supra,* 226 Cal.App.2d 24, 28.) ■ Where the lender has received the benefit of the claimant's performance, and therefore a more valuable security for its note, it is not justified in withholding or appropriating to any other use money originally intended to be used to pay for such performance and relied upon by the claimant in rendering its performance. (*Pacific Ready Cut Homes, Inc.* v. *Title Ins. & Trust Co.* (1932) 216 Cal. 447 [14 P.2d 510]; *Smith* v. *Anglo-California Trust Co.* (1928) 205 Cal. 496, 501-504 [271 P. 898]; and see *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 732; *San Mateo Planing Mill Co.* v. *Davenport Realty Co., supra,* 218 Cal. 702, 710-711; and *Hayward Lbr. & Inv. Co.* v. *Coast*

*etc. Assn.* (1941) 47 Cal.App.2d 211, 214 [117 P.2d 682].)

The terms of a loan agreement may create a trust fund for the benefit of the lender, the owner, and those contributing to the work of improvement. When the lender's objectives are attained by the completion of the improvement, which was bargained for as security, and the owner-borrower no longer has an interest in the loan proceeds because of a sale of his interest, or because he is in default, then the claimants as beneficiaries of the trust created by the loan agreement should be paid out of surplus in the loan account. (*Ralph C. Sutro Co.* v. *Paramount Plastering, Inc.* (1963) 216 Cal.App. 2d 433, 435-437 [31 Cal.Rptr. 174]; *Whiting-Mead Co.* v. *West Coast etc. Co.* (1944) 66 Cal.App.2d 460, 464-467 [152 P.2d 629]; but cf. *Smith* v. *Anglo-California Trust Co., supra,* 205 Cal. 496, 501-502.) In addition the loan agreement may give the supplier of services or materials rights as a third party beneficiary. (*Ralph C. Sutro Co.* v. *Paramount Plastering, Inc., supra,* 216 Cal.App.2d 433, 437; and see concurring opinion, *Whiting-Mead Co.* v. *West Coast etc. Co., supra,* 66 Cal.App.2d 460, 467-468; but cf. *Smith* v. *Anglo-California Trust Co., supra,* 205 Cal. 496, 502; generally, see Comment, 51 Cal.L.Rev., *supra,* 331, 343-344.)

It is unnecessary to examine the provisions of the loan agreement in detail to determine whether respondent would be a third party beneficiary or *cestui qui* trust under its terms. Paragraph 21 thereof provides: "This agreement is made for the sole protection of the undersigned, and the said Association, its successors and assigns, and no other person or persons shall have any right of action hereon." Furthermore the two theories mentioned are predicated upon the satisfaction of the claim of the principal beneficiary, the lender, to receive the security for which he bargained. Where the default occurs before substantial completion of the improvement, any rights created by the provisions of the loan agreement for those furnishing services and materials may be subordinate to those of the lender.

"The *Smith* case [*supra,* 205 Cal. 496 (271 P. 898)] ... was decided upon the dual grounds that the owner and the lender were estopped by their conduct to withhold the fund, and that the claimant had an equitable lien thereon. The essential basis of the opinion is the justifiable reliance upon the fund by the lien claimants." (*Pacific Ready Cut Homes, Inc.* v. *Title Ins. & Trust Co., supra,* 216 Cal.447, 450.) ▮ In the absence of direct evidence of inducement or reliance or other facts from which either may reasonably be inferred no equi-

table lien can be imposed. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 732.) The mere filing of a mechanic's lien claim does not constitute such evidence (*id.*).

The court found as a fact that respondent did the work "in reliance upon the building and loan fund" and incorporated a similar conclusion of law.[8] Appellant attacks the finding and conclusion. In his claim of lien respondent asserted that he contracted with White on May 28, 1963. He testified that he agreed to do the plumbing on each of the five lots for a price of $2,725 for each unit; and that he was to be paid 50 per cent on the "ground rough," 30 per cent on the "top out" and 20 per cent on the "finish." He admitted that he did not know of the arrangement White had with appellant. He did know that White had a loan, although he did not know where, with whom or on what terms it had been granted. He expected to get paid because the matter was being handled through Empire Builders Control. Respondent asserts without citation of chapter or verse that the contract with appellant provided for the payment of loan funds to Empire Builders Control for the purpose of paying contractors, laborers and materialmen. The building loan agreements contain no such provision. The record does reflect, however, that the "Incomplete Loan" accounts were each endorsed "Disbursements to: Empire Builders Control"; that respondent billed White in care of that organization and received payment for three of the jobs on the first bill rendered; and that appellant apparently thought it necessary to notify Empire when it purported to cancel out the loans.

The foregoing evidence permits the inference that Empire was used as some sort of escrow agent representing subcontractors and others furnishing labor and material to the five lots, the owner, and the lender. Presumably Empire knew where the money was coming from, and the lender knew that those dealing with Empire were looking to it for payment. In setting up this system of making payments appellant can be charged with inducing reliance on the payments it would make, and respondent can be said to have relied on the payments to be made to its escrow agent by a financial institution, even though he did not then know its identity. The evidence is sufficient to sustain the findings and conclusions of the trial court. (See *Pacific Ready Cut Homes, Inc.* v. *Title Ins. &*

---

[8]See footnote 5.

*Trust Co., supra,* 216 Cal. 447, 450-451; *Smith* v. *Anglo-California Trust Co., supra,* 205 Cal. 496, 502-503.)

In both *Smith* and *Pacific Ready Cut Homes* the buildings were completed. In the former case the owner's representative sought the balance of the final payment against claimants who had recorded lien claims and given notice to the lender. In the latter, the holder of a recorded lien sought to enjoin sale by a lender who had credited the unexpended final balance against the sum of the original loan. In *A-1 Door* the trial court and District Court of Appeal (Cal.App.) 36 Cal.Rptr. 576, 581, recognized equitable liens, subordinate to bonded stop-notice claims, in claimants who had recorded mechanic's liens. In that case the building was not completed, but the latter rights were recognized in the face of the lender's contentions that the owner's default relieved it of the obligation to advance the final progress payment, and that in any event it was entitled to the funds so it could complete the structure. The Supreme Court reversed as to the equitable liens granted the mechanic's lien claimants for lack of reliance (*supra*), but did not indicate that an equitable lien could not exist in the absence of a completed building.

In *Pacific Ready Cut Homes* the lender was expressly denied the right to offset the balance held against the principal of the loan to the detriment of the lien claimant. It is no great step to conclude that such offset should not be allowed even though the building is not complete, as was done by the District Court of Appeal in *A-1 Door* (Cal.App.) 36 Cal.Rptr. 576, 583. The reasoning behind *Smith* and *Pacific Ready Cut Homes* is as applicable to the claimant putting in the foundation, or the rough plumbing, as it is to the carpenter driving the last spike. All other factors being equal the rights of one contributing to the construction should not depend on the stage thereof at which his contribution was made.

The fact that the charge-back was made before respondent gave his notice, filed his lien, or filed his action should not affect the matter; nor does the fact that appellant recorded notice of default and election to sell. Both of these events transpired in *Pacific Ready Cut Homes* before suit was filed. In that case, action was commenced to enjoin the sale. The rights established were not, however, in the property but in the sum of money which the lender had agreed to advance. It is therefore immaterial that appellant herein sold the property and bid it in without allowance for the sums due respondent. It had his notice of his claim, knew of his recorded lien and of his action to perfect his rights at the time it sold,

and therefore could not defeat his equitable lien by so selling.

It is generally indicated that the recording of a claim of lien is condition precedent to the assertion of an equitable lien even though such fact alone, as has been noted, it not enough to give rise to such a lien. Appellant's objections to the timeliness of the recording of respondent's claim of lien, and the filing of his action have heretofore been shown to be groundless.

■ Appellant further urges that the lien claim, and any equitable lien vested thereon should be denied because the evidence shows that it is false and padded. This contention rests on the evidence adduced as to the cost of the work to the new owner.[9] This was a matter to be resolved by the trial court, and there is evidence to support its findings and conclusions that the judgment represents the reasonable value of the services and material furnished.

It is concluded that the facts and the law support the judgment of the trial court. It is therefore unnecessary to determine what effect the subsequent resale by appellant had upon the respective rights and obligations of it, as lender, and respondent as claimant. ■ It has been conceded in this case that the sale by appellant cut off any right respondent had under his recorded claim of lien. It may be assumed that he had no other right in the property itself or in the proceeds from the subsequent sale. It was therefore error to receive evidence concerning that sale. Neither the conclusions of law nor the judgment are dependent on the evidence or findings of fact regarding that sale, so the error in considering it cannot be prejudicial.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied December 27, 1965, and appellant's petition for a hearing by the Supreme Court was denied February 2, 1966.

---

[9]See footnote 7.