513 F.2d 1304
 URBAN SYSTEMS DEVELOPMENT CORPORATION, Appellant,
v.
NCNB MORTGAGE CORPORATION, and Lester D. Young, Trustee for
NCNB Mortgage Corporation, Appellees.
URBAN SYSTEMS DEVELOPMENT CORPORATION, Appellant,
v.
FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellee.
 Nos. 74-1101, 74-1289.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 29, 1974.
Decided April 10, 1975.
 
 John E. Vanderstar, Washington, D. C. (Covington & Burling, Washington, D. C., W. Pinckney Herbert, Jr., Charlotte, N. C., Donald L. Golden, Washington, D. C., and Andrew D. Taylor, Jr., Charlotte, N. C., on brief), for appellant in Nos. 74-1101 and 74-1289.
 Harry A. Berry, Jr., Charlotte, N. C. (Berry, Bledsoe & Hogewood, Charlotte, N. C., on brief), for appellee in No. 74-1101.
 John E. McDonald, Jr., Charlotte, N. C., for appellee in No. 74-1289.
 Before HAYNSWORTH, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.
 HAYNSWORTH, Chief Judge.
 
 
 1
 This appeal brings before us the question of the possible liability of construction lenders to a terminated general contractor. The district court held that regardless of the ultimate resolution of the controversy between the owner and the general contractor, the contractor had no claim to undisbursed funds in the hands of construction lenders. Summary judgment was entered for the financial institutions, and this appeal by the general contractor followed.
 
 
 2
 The Vector Company, Inc., as owner, and Urban Systems Development Corporation, as general contractor, entered into two separate contracts for the construction of public housing projects in Winston-Salem and Charlotte, North Carolina. Construction of the project in Winston-Salem was to have been financed by First Federal Savings & Loan Association while the project in Charlotte was to have been financed by NCNB Mortgage Corporation. Each of the financial institutions committed itself to advance to Vector construction funds generally keyed to Vector's commitment to make progress payments and the final payment to USDC, the general contractor. Neither obligated itself to see to Vector's application of the advances.
 
 
 3
 Construction proceeded, but not without delay and other problems, until May 1972 when Vector notified USDC of its termination of both contracts and put USDC off both jobs.
 
 
 4
 In the ensuing litigation, the owner and the contractor each claims that the other broke the contracts. USDC also sought to hold the financial institutions responsible to it on a theory that the undisbursed portion of the construction loans were trust funds held by the financial institutions for the benefit of the general contractor. Additionally, there was a claim that it was a party to the Winston-Salem construction loan and that it had continued work in Charlotte in reliance upon a promise made directly to it by NCNB, the Charlotte lender.
 
 I.
 
 5
 For its trust fund theory, USDC relies upon California cases which apply such a theory in a situation in which a separate account had been created, constituting a res to which the trust could attach, where the holder of the funds was obligated to see to their application and where the construction work had been completed and the secured lender had received all that it had bargained for.[1] Were North Carolina to adopt the California trust fund theory, a matter about which we intimate no opinion, it is not applicable to the factual situation presented to us. There were no segregated funds. Neither institution was obligated to see to Vector's application of advances to it by the financial institutions, and, at the time this litigation commenced, neither project had been completed and neither institution had received the security for which it bargained. Indeed, it is not even claimed that either financial institution violated its commitments to Vector or even failed to make any advance requested by Vector. As a matter of fact, advances by NCNB had been suspended for several months before the termination of the construction contract, but that was because a mechanics lien had been filed and the insurer had made an exception of it in its title insurance policy. The loan documents gave it the expressed right to suspend advances until that cloud on its title as secured creditor was removed.
 
 II.
 
 6
 USDC also takes the position that it was a party to the Winston-Salem construction loan agreement. First Federal denies that there was any contractual relation between it and USDC,[2] but even if USDC were a party to a loan agreement with Vector and First Federal, the construction loan agreement would give it no right to recover for itself undisbursed funds in the hands of First Federal. The only purpose in having the contractor join in any construction loan agreement would have been to insure performance of the condition that construction work would not commence until the deed of trust had been filed and recorded, thus assuring priority of First Federal's first lien. The construction loan agreement contained no provision for the disbursement by First Federal of funds to USDC, and no such commitment can be implied from it. There is no appearance of any intent by the parties to the construction loan agreement to benefit USDC except in an indirect sense that it created a source of funds available to Vector to discharge its obligations under the construction contract, provided the conditions of the loan agreement were met. Those conditions, of course, were not met; USDC did not complete the construction work, and First Federal had not received the security of a completed project for which it had bargained.
 
 III.
 
 7
 The claim against NCNB on the basis of continuation of work after an affirmative promise to USDC arises out of the suspension of advances after the exception was included in the title insurance policy.
 
 
 8
 NCNB was informed in December 1971 that the exception would be contained in the title insurance policy which Vector was required to supply to NCNB. NCNB's obligation to make further advances was conditioned upon a clear title insurance policy. It therefore wrote a letter informing Vector that no further advances would be made until the exception for the mechanics lien was removed. The claim of the mechanics lienor became a matter of dispute between Vector and USDC and Vector informed USDC in early February 1972 that it would honor no request for progress payments until that claim was settled to its satisfaction and that of NCNB.
 
 
 9
 Later, there were discussions between representatives of USDC and a representative of NCNB. NCNB took the position that it would make no further advances to Vector until the exception in its title insurance policy was cancelled. These discussions began, according to USDC's attorney, in late February or early March and the NCNB official, early in these discussions, promised that advances would be resumed if the exception to the insurance policy was removed. Still later, the lawyer for USDC obtained an agreement from the title insurance company to remove the exception to the title insurance policy if USDC would furnish it with a bond protecting it against all risk of loss by reason of the claim of the mechanics lienor. Informed of this, NCNB's officer wrote a letter on April 24, 1972 informing USDC, Vector and the title insurance company that it would "be prepared to disburse funds as soon as we receive a clear title of endorsement." Before anything else occurred, however, USDC notified Vector by telegram on May 2, 1972 that it would cease all work on the project unless it received unpaid progress payments it had claimed by May 9. On May 4 Vector mailed to USDC a notice of termination of the construction contract.
 
 
 10
 USDC contends that its affidavits respecting the discussion of the removal of the exception in the title insurance policy at least created a triable issue of fact. We do not think so.
 
 
 11
 The exception in the title insurance policy constituted a default by Vector under the construction loan agreement. Upon the occurrence of such a default, NCNB had several options, one of which was suspension of advances until the default was cured and, once the default was cured, to proceed as if no default had occurred. All that can be made of what was said in late February or March and what was written on April 24 by NCNB's officer is that NCNB was proceeding on that remedial course. While USDC had made substantial progress in getting the exception removed, it was not removed, and the default was not remedied.
 
 
 12
 NCNB's "promise" can not be construed as a promise to disburse funds directly to USDC. The priority of its lien extended to subsequent advances only if they were obligatory. Under the construction loan agreement, obligatory advances were payable to Vector and only upon its periodic request. Upon learning of the default, NCNB gave notice that it would suspend advances and would honor no more requests from Vector for periodic advances, and its promises in February or March and April 1972 were clearly no more than a statement that it would revoke that notice if the default was cured. The promise was to honor its commitments under the construction loan agreement, not to make unsecured advances to USDC. The default, however, was not cured, and Vector made no request for any advance of construction funds after December 1, 1971. Thus, under the agreement, no obligation arose on the part of NCNB to advance further monies.
 
 
 13
 On May 26, 1972 the Housing Authority cancelled its agreement to purchase the completed project from Vector. This was a fresh default under the loan agreement. The note itself reached its ultimate maturity on June 30, so that even if the existing defaults had been cured, advances after that date would not have had the full protection of the deed of trust. No request for any advance having been received by NCNB from Vector during that period, no resolution of any difference between the parties as to the facts could support a conclusion that NCNB was obliged by its agreement to advance further funds to Vector or to USDC.
 
 
 14
 Affirmed.
 
 
 
 [1]
 See Ralph C. Sutro Co. v. Paramount Plastering, Inc., 216 Cal.App.2d 433, 31 Cal.Rptr. 174 (1963); Miller v. Mountain View Savings & Loan Association, 238 Cal.App.2d 644, 48 Cal.Rptr. 278 (1965)
 
 
 [2]
 A construction loan agreement had been prepared. Representatives of Vector and USDC struck one paragraph of the loan agreement and initialed the delineation. First Federal never signed the agreement nor initialed the delineation. Instead it proceeded with the execution and delivery of a note and a deed of trust which, together and without reference to any construction loan agreement, it contends contained all of the terms of the contractual relation between First Federal and Vector