Filed 2/27/14 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BREWER CORPORATION et. al., | D061665 |
| Plaintiffs and Respondents, | Super. Ct. No. 37-2007-74230-CU-BC-CTL) |
| v. | |
| POINT CENTER FINANCIAL, INC., | ORDER DENYING REHEARING AND MODIFYING OPINION |
| Defendant and Appellant. | |

THE COURT:

The petition for rehearing is denied.

It is ordered that the opinion filed herein on January 31, 2014 be modified as follows:

1. On page two of the opinion the second paragraph is deleted, and the following is inserted:

> We next conclude that the trial court correctly found that one stop notice claimant's failure to serve a preliminary 20-day notice (preliminary notice) under section 3097 prevented it from recovering under its bonded stop notice. With regard to this stop notice claimant, the matter is remanded to the trial court for further proceedings on a potentially dispositive factual issue.

2. On page 20 of the opinion the first paragraph is deleted, and the following is inserted:

> As we shall explain, we conclude the trial court erred as a matter of law when it concluded that Dynalectric was not required to serve Lender with a preliminary notice. We also conclude that, as to Dynalectric, this matter must be remanded to the trial court for an evidentiary hearing on the

potentially dispositive factual excuse issue regarding when Dynalectric started work on the project. We first address the legal issue presented by the parties and then turn to the factual excuse issue.

3. On page 27 of the opinion the last paragraph which continues onto page 28 is deleted, and the following is inserted:

Because the record reveals that the parties did not have a full and fair opportunity to litigate the potentially dispositive factual excuse issue, we decline to rule on whether Dynalectric had a factual excuse for not complying with the preliminary notice requirement. In the interest of justice and judicial economy, we remand the matter to the trial court for an evidentiary hearing on the factual excuse issue. The hearing shall be held within 90 days of the issuance of this modification order. This panel shall retain appellate jurisdiction pending the limited remand to the trial court. Within 30 days after the trial court renders its decision on remand, the parties are to report to this court whether either side wishes appellate review of the decision on remand. If appellate review is desired, the parties are to include a stipulated briefing schedule. If neither side wishes appellate review of the decision on remand, the disposition as to Dynalectric shall be as follows:

If trial court finds in favor of Dynalectric on the existence of a factual excuse for not serving a preliminary notice on Lender, the judgment in favor of Dynalectric is affirmed and Dynalectric is to recover its costs on appeal. Alternatively, if trial court finds against Dynalectric on the existence of a factual excuse, the judgment in favor of Dynalectric is reversed and Lender is to recover its costs on appeal.

4. On page 32 of the opinion the last paragraph is deleted, and the following is inserted:

With regard to Dynalectric, the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. In the interest of justice and judicial economy, this panel retains appellate jurisdiction pending this limited remand to the trial court. The evidentiary hearing shall be held within 90 days of the issuance of this modification order. Within 30 days after the trial court renders its decision on remand, the parties are to report to this court whether either side wishes appellate review of the decision on remand. If appellate review is desired, the parties are to include a stipulated briefing schedule. If neither side wishes appellate review of the decision on remand, the disposition as to Dynalectric shall be as follows:

If trial court finds in favor of Dynalectric on the existence of a factual excuse for not serving a preliminary notice on Lender, the judgment in favor of Dynalectric is affirmed and Dynalectric is to recover its costs on appeal.

Alternatively, if trial court finds against Dynalectric on the existence of a factual excuse, the judgment in favor of Dynalectric is reversed and Lender is to recover its costs on appeal.

McINTYRE, Acting P. J.

Copies to:  All parties

Filed 1/31/14 (unmodified version)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BREWER CORPORATION et. al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>POINT CENTER FINANCIAL, INC.,<br><br>    Defendant and Appellant. | D061665<br><br>(Super. Ct. No. 37-2007-74230-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, William R. Nevitt, Jr., Judge.  Affirmed in part, reversed in part and remanded.

Fox Johns Lazar Pekin & Wexler, Michael H. Wexler, R. Gordon Huckins and Dale A. Martin, for Defendant and Appellant Point Center Financial, Inc.

Marks, Finch, Thornton & Baird, Jason R. Thornton, Jon F. Gauthier and Christopher R. Sillari; Hoyt Law Firm and Kenneth C. Hoyt for Plaintiffs and Respondents Brewer Corporation and Division 8.

Lincoln, Gustafson & Cercos and Theodore R. Cercos for Plaintiff and Respondent Brady Company/San Diego, Inc.

Niddrie Fish & Addams and David A. Niddrie for Respondents.

Law Offices of Murray M. Helm, Jr., and Murray M. Helm, Jr., for Respondent Dynalectric Company.

In this case, we are required to interpret several stop notice statutes. (Former Civ. Code, §§ 3082-3267; Civ. Code, §§ 8000-9566, effective July 1, 2012 (Stats. 2010, ch. 697, § 16). Unless otherwise indicated, undesignated statutory references are to the former Civil Code, which was in effect at all times material to this appeal and references to the current Civil Code are designated by the word current.) First, we conclude the trial court correctly followed *Familian Corp. v. Imperial Bank* (1989) 213 Cal.App.3d 681 (*Familian*) when it held that a construction lender must make available to stop notice claimants those amounts the lender has already disbursed to itself on the construction loan.

We next conclude that the trial court correctly found that one stop notice claimant's failure to serve a preliminary 20-day notice (preliminary notice) under section 3097 prevented it from recovering under its bonded stop notice. Nonetheless, the judgment in favor of the stop notice claimant is provisionally reversed and the matter remanded for further proceedings on a potentially dispositive factual issue.

Finally, we conclude that the trial court correctly found one stop notice claimant's failure to give the lender a notice of the commencement of the stop notice action under section 3172 did not bar the stop notice claimant from recovering where the lender suffered no prejudice.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant Point Center Financial, Inc. (Lender) is a licensed real estate broker that facilitated the raising of construction loan funds for a condominium project (the project) located in San Diego, California, adjacent to Balboa Park. In 2006, the owner of the project borrowed $13,625,000 (the loan amount) from Lender to fund the remaining construction of

5

the project (the construction loan). Lender agreed that it acted as a "[c]onstruction [l]ender" for purposes of the stop notice statutory scheme as this term is defined in section 3087. Under the terms of the construction loan, Lender was obligated to obtain about $2.8 million to close the transaction and agreed to use its best efforts to raise the balance of the loan amount in stages. Lender obtained the initial funds and disbursed them to the owner.

As Lender raised funds for subsequent stages of construction, it assigned portions of its beneficial interest in the construction loan trust deed to third-party investors. Lender entered into private loan servicing agreements with its third-party investors, by which it served as each investor's agent with regard to the construction loan. Lender paid the third-party investors interest on their fractional loan interest at a rate of 10 percent and charged a servicing fee of 1.5 percent. Significant to this action, under the private loan placement and fee agreements on each of these loans Lender prepaid itself interest, loan fee/points, loan underwriting and other fees—totaling $1,555,771.37. The loan servicing agreements between Lender and the third-party investors were not recorded as a public record.

Lender contributed some of its own money to fund the construction loan, which resulted in it obtaining a 2.99 percent beneficial interest in the construction loan trust deed and promissory note. In connection with the construction loan, Lender raised and disbursed a total of $12,018,612.50. Lender never funded the remaining balance of the loan amount.

Respondents Brady Company/San Diego, Inc. (Brady), Dynalectric Company (Dynalectric), Division 8, Inc. (Division 8) and Brewer Corporation (Brewer, collectively Respondents) are contractors who provided labor, services, equipment and materials to the project. In June 2007, Brewer served on Lender its bonded stop notice. At that time,

6

Lender was holding sufficient unexpended construction loan funds to cover the claim. Lender, however, did not withhold funds pursuant to Brewer's bonded stop notice claim. The parties agreed that Lender had stop notice liability stemming from its failure to withhold funds under Brewer's bonded stop notice claim.

By October 2007, Lender had fully disbursed all monies in the construction loan fund. Thus, when Lender received additional bonded stop notices from Brady, Dynalectric and Division 8 in March and April 2008, all construction loan funds held by it had already been disbursed.

Respondents filed individual actions against Lender, the owner and others; the trial court later consolidated these actions. All claims against the owner were stayed upon its bankruptcy filing. The bankruptcy court decided the priority of Respondents' mechanics' lien claims. The sole issue before the trial court was Lender's liability with respect to Respondents' bonded stop notice claims. Specifically, Respondents cited section 3166, which prohibits assignments, before or after receipt of a stop notice, and *Familian*, *supra*, 213 Cal.App.3d 681 which holds that "lenders cannot avoid a section 3166 priority by private agreement." (*Id.* at p. 686.)

Relying on *Familian*, the trial court determined that Respondents' stop notice claims took precedence over Lender's alleged contractual right to pay itself all interest, loan fees and other preallocated expenses. The trial court awarded Respondents a total of $1,555,771.37, which was then apportioned among them under section 3167. It further awarded Respondents costs, prejudgment interest and attorneys' fees pursuant to statute. The trial court also denied motions by Lender for entry of judgment against Dynalectric and

Division 8 based on the alleged failure of these claimants to comply, respectively, with sections 3097 and 3172.

DISCUSSION

I. *General Legal Background*

A mechanics' lien is a claim against the real property, which may be filed if a claimant has provided labor or furnished materials for the property and has not been paid. (*Kim v. JF Enterprises* (1996) 42 Cal.App.4th 849, 854.) The mechanics' lien derives from the California Constitution and "courts have uniformly classified the mechanics' lien laws as remedial legislation, to be liberally construed for the protection of laborers and materialmen." (*Connolly Development, Inc. v. Superior Court* (1976) 17 Cal.3d 803, 826-827 (*Connolly*).) The mechanics' lien, however, lost its effectiveness when lenders began recording construction loan trust deeds before commencement of construction. (*Id.* at p. 827.) The recorded construction loan trust deed is superior to any later recorded mechanics' lien; thus, if the lender forecloses on the property, the mechanics' lien has no value. (10 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 28:68, p. 234.) "Even if the prior lien is not foreclosed, if the value of the property does not exceed the debt secured by the prior lien, there will be no equity in the property to secure the mechanics['] liens." (*Ibid.*)

The Legislature created the stop notice, now referred to as the stop payment notice, as an additional and cumulative remedy to protect laborers and materialmen. (*Connolly*, *supra*, 17 Cal.3d at p. 809; current § 8044, subd. (c).) As our high court explained,

8

" '[l]abor and material contractors [in the construction industry] are in a particularly vulnerable position. Their credit risks are not as diffused as those of other creditors.  They extend a bigger block of credit, they have more riding on one transaction, and they have more people vitally dependent upon eventual payment.  They have much more to lose in the event of default.  There must be some procedure for the interim protection of contractors in this situation.' "  (*Connolly*, at p. 827.)

After giving a 20-day preliminary notice (§ 3160), a laborer or materialman may serve a stop notice upon the owner or the construction lender.  (§§ 3158, 3159.)  A timely served stop notice obligates the owner or lender to withhold funds for the benefit of the stop notice claimant.  (10 Miller & Starr, *supra*, § 28:74, pp. 248-249.)  Once a stop notice is timely served on an owner or lender, an action to enforce the stop notice must be commenced within 90 days of the deadline to serve the stop notice, regardless of whether the stop notice was served early.  (§ 3172.)  The party whom received the timely stop notice is required to withhold funds in the amount of the stop notice until the expiration of the claimant's deadline to file an action to enforce the stop notice, plus five additional days for receipt of a notice of commencement of the action under section 3172.  (§ 3172.)  If several stop notices have been filed and not enough money exists to pay them all, stop notice claimants share pro rata in the available funds.  (§ 3167.)  If a lender fails to withhold funds required by the bonded stop notice, it is personally liable to the claimant for the full amount of the claim.  (*Connolly*, *supra*, 17 Cal.3d at p. 809.)

## II. Familian *Issue*

### A. Background

A stop notice claimant obtains priority over any "assignment" of the construction loan funds, whether the assignment is made before or after a stop notice is served. (§ 3166.) In *A-1 Door & Materials Co. v. Fresno Guarantee Sav. & Loan Ass'n* (1964) 61 Cal.2d 728 (*A-1 Door*), our high court interpreted subsection (h) of Code of Civil Procedure section 1190.1, the statutory predecessor to section 3166. (*A-1 Door*, at pp. 731-732; *Familian*, *supra*, 213 Cal.App.3d at p. 684.) In *A-1 Door*, the contract between the lender and property owners required that the property owners assign the construction loan funds to the lender as security for their obligation to repay the loans and for any of their other obligations to the lender. (*A-1 Door*, at p. 735.) When construction stopped, the lender retained the unexpended loan proceeds per its agreement with the property owners. (*Id.* at p. 731.) Unpaid materialmen issued a stop notice and then sued the lender for enforcement. (*Ibid.*) The lender argued that there were no undisbursed funds to garnish because its contract with the property owners allowed it to retain possession of the funds. (*Id.* at pp. 733, 735.) Our high court disagreed, concluding that the anti-assignment provision in subsection (h) of Code of Civil Procedure section 1190.1 "require[d] that funds earmarked for construction purposes be used to pay suppliers of labor and materials who file claims under the subsection and therefore supersede[d] the private arrangements of borrower and lender." (*A-1 Door*, at p. 734.)

In *Familian*, the court answered a question of first impression, whether a secured construction lender could defeat a bonded stop notice claimant's statutory priority to

construction loan proceeds by segregating the fund into preallocated accounts and thereafter deducting charges and interest as accrued. (*Familian*, *supra*, 213 Cal.App.3d at p. 683.) During construction, the lender paid itself for preallocated loan expenses including interest, loan fees, document preparation fees, and general and administrative expenses. (*Ibid.*) The lender then received stop notice claims greatly exceeding the remaining loan funds. (*Ibid.*) The lender foreclosed on the property and interplead the remaining loan funds, arguing that the laborers and materialmen were entitled to a pro rata share of this fund only. (*Ibid.*)

Interpreting section 3166, the *Familian* court rejected the lender's argument. It held that the preallocation of funds to pay points, interest and other non-construction costs constituted an assignment within the meaning of section 3166 that was subordinate to the perfected claims of laborers and materialmen. (*Familian*, *supra*, 213 Cal.App.3d at pp. 686-687.) It explained that "[s]ection 3166 does not prohibit [the lender's] practices; it simply assures priority to those who contribute the labor and materials to improve the property and increase the value of the lender's security." (*Id.* at p. 687.)

The *Familian* court then addressed the lender's argument that "a stop notice claimant's priority applie[d] only to 'unexpended' or 'undisbursed' loan funds" and that stop notice claimants were not entitled to priority for fees, points and interest incurred and paid to a lender before the borrower commenced work on the project as these funds had already been spent. (*Familian*, *supra*, 213 Cal.App.3d at p. 687.) The court quickly rejected this contention stating: "[T]his argument seeks to engraft a loophole into section 3166. A construction lender would need only to deduct its profits at the inception of the loan to assure a double recovery at the expense of those who enhance the value of the property by

11

supplying labor and materials." (*Ibid.*) Accordingly, it held "that a preallocation of construction loan funds and periodic disbursements to the lender are assignments within the meaning of section 3166. Therefore, 'whether made before or after a stop notice or bonded stop notice is given to a construction lender,' the assignment does not take priority over the stop notice. (§ 3166.) Laborers and materialmen are entitled to retain the protection historically afforded under section 3166 just as lenders retain the right to foreclose on their security interest in the property, including its enhanced value as a result of the construction." (*Familian*, at p. 688.)

B. Analysis

Lender contends that *Familian* was wrongly decided and should be rejected. Alternatively, it asserts we should not follow *Familian* as the facts are distinguishable. Finally, it claims that the trial court went beyond the *Familian* facts and holdings. We address each contention, in turn.

1. *Familian* Is Not Legally Flawed

Section 3166 states: " 'No assignment by the owner or contractor of construction loan funds, whether made before or after a stop notice or bonded stop notice is given to a construction lender, shall be held to take priority over the stop notice or bonded stop notice, and such assignment shall have no effect insofar as the rights of claimants who give the stop notice or bonded stop notice are concerned.' " The *Familian* court held "that a preallocation of construction loan funds and periodic disbursements to the lender" constituted assignments within the meaning of section 3166. (*Familian*, supra, 213 Cal.App.3d at

12

p. 688.) The trial court followed the *Familian* court's interpretation of the word "assignment" in rendering judgment for the stop notice claimants. Thus, we too are called upon to interpret the meaning of an assignment as used in section 3166.

This presents a question of law subject to de novo review. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76-77.) The objective of statutory interpretation is to ascertain and effectuate legislative intent. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) We examine the words of the statute, giving them a plain and commonsense meaning, the entire substance of the statute, and consider the statutory framework as a whole. (*People v. Murphy* (2001) 25 Cal.4th 136, 142-143.) Where the statutory language in dispute is clear and unambiguous, there is no need for construction and we should not indulge in it. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349.) "Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055.) The separation of powers doctrine requires that we "limit ourselves to interpreting the law as written and leave for the . . . Legislature the task of revising it as [it might] deem wise." (*People v. Garcia* (1999) 21 Cal.4th 1, 14-15; Cal. Const., art. III, § 3.)

An assignment is defined as a "transfer of rights or property." (Garner, Black's Law Dictionary (9th ed. 2009) p. 136.) Here, the full amount of the loan was for the purpose of "fund[ing] the subject construction project." The parties, however, agreed that Lender could prepay itself interest, a loan fee and other fees. This agreement amounts to a transfer of

13

rights over the construction loan funds from the borrower to Lender and constituted an assignment.

Lender does not acknowledge this inescapable conclusion; rather, it contends that disbursements to itself are not assignments because the disbursements were simply the means by which the borrower performed its contractual obligation to pay interest and other items of bargained for consideration to Lender. This argument confuses the assignment (i.e., the agreement between the parties) with the act of carrying out the assignment (i.e., disbursing the construction loan funds). Taking Lender's argument to its logical conclusion, Lender appears to assert that contractual language allowing it to disburse some of the construction loan funds to itself can never constitute an assignment. This result is contrary to the entire purpose of section 3166, which is to supersede the private arrangements of the borrower and lender to ensure that construction loan funds "earmarked for construction purposes be used to pay suppliers of labor and materials who file claims under [section 3166]." (*A-1 Door*, *supra*, 61 Cal.2d at p. 734.) Moreover, Lender's argument makes the existence of an assignment dependent upon *when* it removed money from the construction loan funds. As Respondents note, construction loan agreements preallocating some of the construction loan funds back to a lender are drafted before construction loan funds are disbursed; thus, a lender can control when funds are expended or earned.

Lender presents lengthy arguments explaining why money it has already removed from the construction loan funds pursuant to its agreement with the borrower are unavailable to stop notice claimants. It notes that sections 3159 and 3162 require that a construction lender withhold sufficient funds when a bonded stop notice is filed. Section

14

3167 provides that if the money withheld is insufficient to pay any valid claims in full, that the funds will be distributed on a pro rata basis. Lender asserts that when section 3166 is construed in the context of the entire statutory scheme, particularly the withholding provisions of sections 3159, 3162 and 3167, that section 3166 disallows an assignment only if the assignment reduces the *unexpended* funds available to satisfy a stop notice claim. In other words, it cannot "withhold" funds that have already been disbursed based on an assignment.

While Lender's argument has superficial appeal, its proposed construction defeats the purpose of the stop notice procedure. The Legislature created the stop notice law to give laborers and materialmen priority over lenders to payment from the construction loan fund. (*Connolly*, *supra*, 17 Cal.3d at p. 827.) A lender could simply draft the construction loan agreement to provide that all interest, fees, points or other costs were due before worked started on a project. As our high court sagely noted when it interpreted the predecessor statute to section 3166 (former Code Civ. Proc., § 1190.1, subd. (h)), if the terms of the construction loan agreement determined the rights of stop notice claimants "the parties to the contract could effectively eliminate those rights." (*A-1 Door*, *supra*, 61 Cal.2d at p. 734.) The *Familian* court recognized this, stating such an interpretation would allow lenders and borrowers to "engraft a loophole into section 3166." (*Familian*, *supra*, 213 Cal.App.3d at p. 687.) "A construction lender would need only to deduct its profits at the inception of the loan to assure a double recovery at the expense of those who enhance the value of the property by supplying labor and materials." (*Ibid*.)

15

Lender is correct that cases decided before *Familian* involved claims against unexpended funds. (*Calhoun v. Huntingtion Park First Savings & Loan Assoc.* (1960) 186 Cal.App.2d 451, 455; *Rossman Mill & Lumber Co. v. Fullerton Savings & Loan Assoc.* (1963) 221 Cal.App.2d 705, 708; *A-1 Door, supra,* 61 Cal.2d at pp. 731-732; *Miller v. Mountain View Savings & Loan Assoc.* (1965) 238 Cal.App.2d 644, 649-650, 651, 652, fn. 5.) That the *Familian* court decided an issue of first impression does not render its result suspect. As one commentator noted, "because the stop notice remedy is so highly effective for stop notice claimants, construction lenders have made several attempts over the years to structure a construction loan that effectively circumvents it." (Campbell, Stop Notice Risks for Construction Lenders (Jan., 2010) Los Angeles Lawyer, at p. 18.)

Lender argues that part of the money preallocated and disbursed to it under the terms of the construction loan agreement was "earned," meaning the money constituted reimbursements for out-of-pocket costs and expenses associated with locating lenders, raising funds, paying salaries, etc. It also argued that "the funds paid to [it] and the private party lenders were used to satisfy legitimate costs of construction." Lender's contention is supported by one commentator who advocates for a more "tailored approach" that "unearned prepayments, if proved as a matter of fact, do not qualify as sums earned and paid before receipt of the bonded stop notice, and do not reduce the fund available to the stop notice claimant." (20 No. 2 Miller & Starr, Real Estate Newsalert 1 (Nov. 2009).) On the other hand, Respondents suggest that all distributions to Lender out of the construction loan fund were "unearned," meaning they constituted profits. The parties conceded, however, that the issue whether the distributions Lender received were earned or unearned

16

was never argued below.  As the case was not tried on this theory, it is impossible for us to address it.

In any event, we conclude that labeling the disbursements Lender received as earned versus unearned is of little consequence.  Our high court made it clear in *Connolly*, over 36 years ago, that monies in a construction loan fund are intended to pay construction costs.  (*Connolly*, *supra*, 17 Cal.3d at pp. 807, 820, 825.)  It held that a construction loan fund is "not available for ordinary expenses." (*Id.* at p. 820.)  Additionally, when served upon the construction lender a stop notice "attaches only to funds previously committed to finance construction of the improvement (section 3162)." (*Id.* at p. 826.)  Here, the parties agreed in the joint trial readiness conference report that the full amount of the loan was for the purpose of "fund[ing] the subject construction project."  Although Lender argued in its reply brief that "the funds paid to [it] and the private party lenders were used to satisfy legitimate costs of construction," it cited absolutely no evidence to support this statement.

Finally, it is worth noting that the *Familian* court did not invalidate the pre-allocation of construction loan funds by lenders.  Lenders remain free to draft construction loan agreements to give themselves a contractual right to priority.  It is only in situations, such as the one presented here that lenders' contractual priority cedes to a stop notice claimants' statutory priority, allowing a court to reach back to funds a lender has disbursed to itself as a source to pay stop notice claimants.

2. *Familian* Is Not Distinguishable

Assuming we will follow the *Familian* analysis, Lender alternatively argues that the judgment in favor of Respondents should be reversed based on the distinguishable facts of this case.

Lender first points out that in *Familian*, the lending bank foreclosed on its trust deed (*Familian*, *supra*, 213 Cal.App.3d at p. 683); thus, it obtained a double recovery by obtaining the real property and that value added to the property by the stop notice claimants' improvements. In contrast here, the property was encumbered by a "super-priority" first trust deed that was foreclosed thereby wiping out the Lender's first trust deed. Accordingly, Lender asserts that it recovered nothing and was not unjustly enriched by the stop notice claimants' contributions to the project.

Stated differently, Lender asserts that the stop notice claimants should not be entitled to statutory priority under section 3166 because it suffered a loss, rather than a gain. We disagree as Lender's argument makes application of section 3166 priority dependent upon equitable principles. The Legislature eliminated the judicially developed equitable lien remedy and confined recovery to statutory mechanics' lien and stop notice procedures when it enacted section 3264. (*Sofias v. Bank of America* (1985) 172 Cal.App.3d 583, 586.) The *Familian* court acknowledged the existence of section 3264 (*Familian*, *supra*, 213 Cal.App.3d at pp. 685-686) and unequivocally held that "[l]enders cannot avoid a section 3166 priority by private agreement." (*Id.* at p. 686.) Contrary to Lender's assertion, the theme in *Familian* was not the avoidance of unjust enrichment. Simply put, whether a

18

lender forecloses on its trust deed or ultimately realizes a gain or loss is not relevant to application of section 3166.

Lender next claims that *Familian* is distinguishable because the lending bank segregated the funds to pay itself from the remainder of the loan funds by setting up preallocated accounts. While the *Familian* court articulated the issue presented as whether "a secured construction lender [can] defeat a bonded stop notice claimant's statutory priority to construction loan proceeds by segregating the fund into preallocated accounts and thereafter deducting charges and interest as accrued[,]" the segregation of the funds into different accounts did not factor into its analysis. (*Familian*, *supra*, 213 Cal.App.3d at p. 683.) Instead, the *Familian* court broadly held that "a preallocation of construction loan funds and periodic disbursements to the lender are assignments within the meaning of section 3166." (*Id.* at p. 688.) Similarly here, the parties agreed that Lender could preallocate construction loan funds to pay interest and loan fees and disburse to itself the construction loan funds to pay accrued interest on the loan. Thus, the lack of segregated accounts does not distinguish the instant case from *Familian*.

Finally, Lender makes a number of arguments directed at specific portions of the trial court's award, contending that the trial court went beyond the facts and holding of *Familian*. Lender claims the trial court erred when it awarded Respondents the total amount of interest paid on the loan because it received a small interest payment and the third-party investors received the rest. Lender asserts we should reverse that portion of the judgment reflecting interest paid to the third-party investors, approximately $1,012,200. Lender's argument misses the point.

19

The purpose of section 3166 is to afford stop notice claimants priority over a construction lender's assignment of construction funds. (See *Familian*, *supra*, 213 Cal.App.3d at p. 687.) The loan servicing agreements that Lender entered into with each of the third-party investors constituted another type of assignment. Under the loan servicing agreements Lender paid itself interest out of the construction loan funds and later disbursed the majority of the interest payments to the third-party investors. The fact Lender did not retain the interest payments is irrelevant to the *Familian* analysis. Additionally, we note that the loan servicing agreements contain an indemnity clause whereby each third-party investor agreed to indemnify Lender to the extent of the fractional interest of each third-party investor for any claims incurred by Lender not covered by insurance so long as the Lender acted in good faith and without gross negligence or willful misconduct.

Lender also complains the trial court improperly awarded Respondents a loan servicing fee paid to Lender by the third-party investors in the amount of about $136,380. Lender claims that the third-party investors paid the fee. We reject this argument as it ignores that Lender was paid its loan servicing fee via monthly deductions from payments received from the owner. Next, Lender asserts the trial court improperly awarded Respondents $1,540 representing tax service and credit report charges because these amounts were reimbursements from the owner and not profits. The trial court made a finding that these charges should be part of the *Familian* award because they came out of the construction loan funds. It is irrelevant that Lender did not profit.

20

Lastly, Lender claims the trial court erred in awarding Respondents $19,500, representing the amount of fees paid to Lender by the owner in connection with a $390,000 supplemental loan to owner for the purpose of paying city permit fees, noting that the owner paid off the loan before the service of the first stop notice. We disagree. Trial testimony established that the owner paid Lender a loan fee of $476,875 at closing and that Lender later loaned $390,000 of the fee back to the owner to pay for permits required to allow the start of construction. The supplemental loan was secured by a trust deed on the same property enhanced by Respondents' labor, equipment and material. This evidence establishes that the loan was for the purpose of financing the construction of improvements on the property. Thus, the trial court properly included the loan fee from this supplemental loan as part of its *Familian* award.

### III. *Dynalectric Issue*

Service of a preliminary 20-day notice (preliminary notice) is required to enforce a mechanic's lien or stop notice claim. (§ 3097, subds. (a)-(b) [a preliminary notice is "a necessary prerequisite to the validity of any claim of lien"].) A preliminary notice must be served within 20 days after the claimant has begun providing labor, services, equipment, or material for which a mechanic's lien or stop notice claim will be made. (§ 3097, subd. (d).) The Legislature imposed the notice requirement to alert property owners and lenders "to the fact that the property or funds involved might be subject to claims arising from contracts to which they were not parties and would otherwise have no knowledge." (*Romak Iron Works v. Prudential Ins. Co.* (1980) 104 Cal.App.3d 767, 778.)

21

The Legislature intended "to exact strict compliance with the preliminary notice requirement." (*Ibid.*; *IGA Aluminum Products, Inc. v. Manufacturers Bank* (1982) 130 Cal.App.3d 699, 703-704 [same].)

Lender contends the trial court erred as a matter of law when it concluded that Dynalectric, a direct contractor, was not required to serve Lender with a preliminary notice under subdivision (b) of section 3097 (§ 3097(b)) as a condition to maintaining its stop notice claim because service of a preliminary notice by a stop notice claimant under a direct contract with the owner is required unless the claimant is the general contractor. Dynalectric asserts the plain language of subdivision (a) of section 3097 (§ 3097(a)) exempted it from serving a preliminary notice on Lender.

Dynalectric also contends we need not interpret section 3097 because, even if it was not exempt from the preliminary notice requirement under section 3097, it was not required to serve a preliminary notice on Lender because the undisputed facts establish it commenced work before Lender recorded its construction loan trust deed. In other words, Dynalectric contends it had a factual excuse for not serving a preliminary notice on Lender. (*Kodiak Industries, Inc. v. Ellis* (1986) 185 Cal.App.3d 75, 83-85 [a private work lender stop notice claimant who commences work on a project before the construction loan trust deed is recorded is not required to serve the construction lender with a preliminary notice under section 3097] (*Kodiak*).) Assuming we agree with Dynalectric that the undisputed facts establish it commenced work before Lender recorded its construction loan trust deed, then Dynalectric claims the judgment in its favor can be affirmed on this alternative ground.

As we shall explain, we conclude the trial court erred as a matter of law when it concluded that Dynalectric was not required to serve Lender with a preliminary notice. We also conclude that the judgment in favor of Dynalectric should be provisionally reversed and the matter remanded to the trial court for an evidentiary hearing on the potentially dispositive factual excuse issue regarding when Dynalectric started work on the project. We first address the legal issue presented by the parties and then turn to the factual excuse issue.

A.  Legal Issue

It is undisputed that Dynalectric was a contractor with a direct contract with the owner of the project and that it did not serve Lender with a preliminary notice.  In a nutshell, Lender claims Dynalectric was required to serve a preliminary notice under section 3097(b) because it was a direct contractor and not an exempt general contractor. Dynalectric asserts the plain language of section 3097(a) exempted it from serving a preliminary notice on Lender and, when properly interpreted, it was also exempt under section 3097(b).

In interpreting section 3097 we apply the general rules of statutory interpretation. (*Ante*, pt. II.B.1.)  We start with the plain language of the statute.  In relevant part, section 3097 provides that a preliminary notice must be given before filing a stop notice under the following circumstances:

> "(a) Except one under direct contract with the owner . . . every person who furnishes labor, service, equipment, or material [to a work of improvement] shall, as a necessary prerequisite to the validity of any . . . notice to withhold, cause to be given to the owner or reputed owner, to *the original contractor*, or reputed contractor, and to the

23

construction lender, if any, or to the reputed construction lender, if any, a written preliminary notice as prescribed by this section.

"(b) Except *the contractor* . . . all persons who have a direct contract with the owner and who furnish labor, service, equipment, or material [to a work of improvement] shall, as a necessary prerequisite to the validity . . . of a notice to withhold, cause to be given to the construction lender, if any, or to the reputed construction lender, if any, a written preliminary notice as prescribed by this section." (Italics added.)

The term " '[o]riginal contractor' " used in section 3097(a) is defined as "any contractor who has a direct contractual relationship with the owner." (§ 3095.) The term "the contractor" used in section 3097(b) is not defined. Accordingly, "the contractor" must mean something different than an original contractor with a direct contractual relationship with the owner.

Taking the liberty to rearrange the wording of these subdivisions and substitute "any contractor who has a direct contractual relationship with the owner" for the term "original contractor," section 3097(a) states: every person who furnishes labor, etc. to a work of improvement, except one under direct contract with the owner, must give notice to a lender or any contractor who has a direct contractual relationship with the owner. In turn, section 3097(b) states: all persons having a direct contract with the owner that furnishes labor, etc. to a work of improvement, except the contractor, must give the notice to the lender. The subdivisions are plainly different. Section 3097(a) requires notice to a lender or any other contractors who have a direct contractual relationship with the owner, while section 3097(b) requires notice only to a lender.

We now take the rearranged subdivisions to determine whether Dynalectric, a person that furnished labor etc. through a direct contract with the owner, was required to serve a

24

preliminary notice on Lender under either section 3097(a) or (b). Plainly, and as conceded by Lender, section 3097(a) did not require such notice because Dynalectric had a direct contractual relationship with the owner. Thus, we turn to section 3097(b).

Again, our rearranged section 3097(b) states: all persons having a direct contract with the owner that furnishes labor, etc. to a work of improvement, except the contractor, must give the notice to the lender. Dynalectric qualifies as a person having a direct contract with the owner; thus, it was required to give notice to the lender under section 3097(b) unless it qualified as "the contractor."

Interpreting the predecessor to section 3097, the court in *Korherr v. Bumb* (9th Cir., 1958) 262 F.2d 157, interpreted the term "the contractor" to refer to "the general or prime contractor." (*Id.* at p. 161.) Other courts have adopted this interpretation. (*Kodiak*, *supra*, 185 Cal.App.3d at p. 82, fn. 3 [the contractor "has sensibly been construed to mean the general or prime contractor for the entire project"]; *Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1561 [same]; *Shady Tree Farms v. Omni Financial* (2012) 206 Cal.App.4th 131, 138 [same] (*Shady Tree*).) As noted by the *Shady Tree* court, section 3097(b) "refers to *the* contractor rather than *a* contractor. The use of 'the' indicates a single person, i.e., the prime or general contractor for the project, not multiple contractors, i.e., the subcontractors or others with direct contracts with the owner." (*Shady Tree*, *supra*, at p. 138.) Accordingly, as a person having a direct contract with the owner, Dynalectric was required to give notice to Lender under section 3097(b) because it was not the general or prime contractor on the project.

Recent amendments to the mechanic's lien laws support this interpretation. The Legislature indicated that the 2010 amendments were intended to, among other things, "recodify, reorganize, and clarify the mechanics lien statute; modernize terminology and eliminate inconsistencies in language; make provisions more readable and easier to use; enact separate provisions for private and public works; [and] modernize and streamline existing notice requirements." (Sen. Jud. Com., analysis of Sen. Bill No. 189 (2009-2010 Reg. Sess.) at p. 1, as amended Dec. 15, 2009 (Sen. Jud. Com. Analysis); available at <http://www.leginfo.ca.gov/pub/09-10/bill/sen/sb_0151-0200/sb_189_cfa_20100111_183140_sen_comm.html> [as of Jan. 31, 2014].) The California Law Revision Commission "placed its highest priority on drafting a 'nonsubstantive reorganization of the existing mechanics lien statute that would modernize and clarify existing law.' " (*Id.* at p. 2.) The Legislature noted that section 3097(b) "contain[ed] an ambiguity relating to whether a general contractor must give preliminary notice to a construction lender on a private work." (*Id.* at p. 4.) The bill clarified "that a general contractor must give preliminary notice to a construction lender on a private work." (*Ibid.*)

Thus, the Legislature amended section 3097 to state that a claimant "shall give preliminary notice to the following persons: [¶] (1) The owner or reputed owner. [¶] (2) The direct contractor or reputed direct contractor to which the claimant provides work, either directly or through one or more subcontractors. [¶] (3) The construction lender or reputed construction lender, if any." (Current § 8200, subd. (a).) "Notwithstanding the foregoing subdivisions: [¶] (1) A laborer is not required to give preliminary notice. [¶] (2) *A*

26

*claimant with a direct contractual relationship with an owner or reputed owner is required to give preliminary notice only to the construction lender or reputed construction lender, if any.*" (Current § 8200, subd. (e), italics added.)

Once again, our rearranged section 3097(b) states: all persons having a direct contract with the owner that furnishes labor, etc. to a work of improvement, except the contractor, must give the notice to the lender. The ambiguity referred to in the Senate Judicial Commission Analysis is the reference to "the contractor" in section 3097(b) as this term was eliminated from the amended statute. (See current § 8200.) The current statute now provides that "[a] claimant with a direct contractual relationship with an owner or reputed owner is required to give preliminary notice only to the construction lender or reputed construction lender, if any." (Current § 8200, subd. (e)(2).) Just as the Legislature intended, the amended statute resolves the ambiguity in section 3097(b) by providing that any "direct contractor," including a general contractor, must serve a preliminary notice on the lender. (Sen. Jud. Com. Analysis, *supra*, at p. 4.) As further support for this conclusion, current section 8018 defines "[d]irect contractor" as "a contractor that has a direct contractual relationship with an owner. A reference in another statute to a 'prime contractor' in connection with the provisions in this part means a 'direct contractor.' "

In summary, the trial court erred when it concluded that Dynalectric was not required to serve a preliminary notice on Lender.

B.  Factual Excuse Issue

1.  Facts

Before trial, Lender moved for nonsuit or a partial judgment under Code of Civil Procedure section 631.8 to determine the validity of Dynalectric's stop notice claim on undisputed facts.  Lender argued that, as a matter of law, Dynalectric was required to serve Lender a preliminary notice, Dynalectric did not do so and was barred from pursuing a stop notice claim against Lender.  In opposition to the motion, Dynalectric argued it was not required to serve Lender a preliminary notice because the plain language of section 3097(a) and (b) exempted it from serving a preliminary notice on Lender.  Dynalectric also asserted a factual defense that it was not required to serve a preliminary notice because there was no lender when it began work on the project.

At the hearing on the motion, Lender presented an oral reply to Dynalectric's opposition that addressed the legal issue, but not the factual issue of when Dynalectric began work on the project.  Lender later admitted it "was nowhere on the scene" in 2004 when Dynalectric executed a letter of intent with the owner, but that the initial work Dynalectric did was of "no consequence" because it pertained to a "separate work of improvement."  Lender claimed that another judge found that the "current work of improvement" started a few weeks before it recorded its trust deed in June 2006, that Dynalectric first started work under the contract in September 2006, and that Dynalectric prepared its preliminary notice 20 days after it started work, but never served Lender.  Lender asserted that even if the court had "question of fact" regarding whether Dynalectric was excused from the preliminary notice requirement, it could still rule on the legal issue.

28

Thereafter, the trial court denied Lender's motion to find Dynalectric's stop notice claim invalid. The court later clarified that it ruled on the legal issue of whether Dynalectric was required to file a preliminary notice on Lender, not the factual issue. Lender filed a "Motion for Reconsideration of Prior Motion Re Dynalectric's Statutory Duty to Serve a Preliminary Notice on Point Center; for Renewal of Prior Motion as to Said Duty Issue; For Relief Based on Mistake, Inadvertence, Surprise or Excusable Neglect; For a Determination, as a Motion in Limine, that Dynalectric's Contention that it was Excused for Factual Reasons from Serving a Preliminary Notice on Point Center Raises a Triable Issue of Fact; and for Related Relief" (the reconsideration motion). Among other things, Lender explained during argument that its in limine motion requested that the trial court reserve for trial any determination on the factual issue regarding whether Dynalectric was excused from serving a preliminary notice on Lender. The trial court denied the reconsideration motion.

2. Analysis

In its opening brief, Lender focused exclusively on the trial court's ruling on the legal issue. Seizing on the fact Lender failed to argue the factual excuse issue as a basis for reversing the trial court's ruling, Dynalectric contends Lender presented no evidence showing the existence of a factual dispute regarding when Dynalectric started work on the project, that Lender had a full and fair opportunity to present such evidence and the trial court's ruling in Dynalectric's favor should be affirmed on the alternative ground that the undisputed facts show Dynalectric commenced work on the project before Lender recorded its construction loan trust deed. Alternatively, should we conclude that triable issues of fact remain unresolved, Dynalectric requests that we remand the matter for further proceedings.

29

The parties impliedly agree that a ruling on the factual excuse issue potentially moots the legal issue that we addressed above. (*Ante*, pt. III.A.) Our review of the record reveals, however, that Lender did not have the opportunity to present evidence on the factual excuse issue. Dynalectric raised the factual excuse issue in its opposition to Lender's motion and presented a declaration to support its argument. Lender provided an oral reply at the hearing on the motion. It asserted the court could rule on the legal issue even if factual questions existed regarding whether Dynalectric was excused from the preliminary notice requirement. After the trial court ruled in Dynalectric's favor on the legal issue, Lender filed its multi-faceted reconsideration motion which argued that Dynalectric's factual excuse issue should be tried. Lender stated during oral argument on the reconsideration motion that it had a number of exhibits and witnesses to address the factual excuse issue. Although Dynalectric chides Lender for not presenting this evidence as part of its reconsideration motion, Lender was not required to do so because the court made no factual determination that was subject to reconsideration. Lender argued below that the factual excuse issue needed to be tried. Dynalectric agrees as it alternatively argued on appeal that we could remand the matter for further proceedings.

Because the record reveals that the parties did not have a full and fair opportunity to litigate the potentially dispositive factual excuse issue, we decline to rule on whether Dynalectric had a factual excuse for not complying with the preliminary notice requirement. In the interest of justice, we provisionally reverse the judgment in favor of Dynalectric and remand the matter to the trial court for an evidentiary hearing on when Dynalectric started work on the project. If trial court finds in favor of Dynalectric on the existence of a factual

30

excuse for not serving a preliminary notice on Lender the judgment in favor of Dynalectric should be affirmed. Alternatively, if trial court finds against Dynalectric on the existence of a factual excuse, the judgment in favor of Dynalectric should be reversed.

IV. *Motion Regarding Division 8*

A. Facts

On April 10, 2008, Division 8 served Lender with its bonded stop notice and filed a complaint to foreclose its mechanic's lien on the project. In May 2008, Division 8 filed a first amended complaint which added a stop notice claim against Lender. In July 2008, Division 8 served its first amended complaint on Lender. Division 8, however, never served Lender with a notice of the commencement of its stop notice action within five days after filing its complaint as required by section 3172.

During trial, Lender orally moved under Code of Civil Procedure section 631.8 for entry of judgment against Division 8 for Division 8's failure to serve a notice of commencement of action under section 3172. The trial court considered a supplemental trial brief filed by Lender and heard oral argument. Upon conclusion of the argument, the trial court orally denied Lender's motion, finding that Division 8 substantially complied with the notice of commencement requirements and, even if it had not, that Lender was not prejudiced by Division 8's failure to serve the notice.

B. Analysis

An action to enforce a stop notice must be commenced between 10 and 90 days after filing of the stop notice. (§ 3172; current § 8550, subd. (a)-(c).) Commencement of the action within the 90-day period is a necessary step in perfecting a stop notice claimant's

31

right to the funds held by the lender. If the action is filed late, the notice is no longer effective and the lender must release the funds previously held pursuant to the stop notice. (§ 3172; current § 8550, subd. (d).) Within five days after filing an action to enforce the stop notice, the claimant "shall" give notice of the commencement of the action to the same persons who have received the stop notice. (§ 3172; current § 8550, subd. (e).)

Lender contends the trial court erred when it refused to enter judgment in its favor based on Division 8's failure to ever serve a notice of the commencement of its stop notice action because the use of the word "shall" in the statute requires mandatory compliance. We disagree.

Again, we are faced with a question of statutory interpretation subject to de novo review. (*Bialo v. Western Mutual Ins. Co.*, *supra*, 95 Cal.App.4th at pp. 76-77.) "[T]here is no simple, mechanical test for determining whether a [statutory] provision should be given 'directory' or 'mandatory' effect." (*Morris v. County of Marin* (1977) 18 Cal.3d 901, 909.) Generally, "requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary [legislative] intent is clearly expressed." (*Edwards v. Steele* (1979) 25 Cal.3d 406, 410.) "In ascertaining probable intent, California courts have expressed a variety of tests. In some cases, focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment. [Citations.] Other cases have suggested that a time limitation is deemed merely directory 'unless a consequence or penalty is provided for failure to do the act within the time commanded.' " (*Ibid*.)

32

Looking at the language of section 3172, the notice of commencement of action is not required until *after* the lender has already been served with a stop notice action. Thus, the purpose of the notice of commencement of action does not serve to "notify" the lender of the pending stop notice. Instead, the notice of commencement of action is more likely designed as a safeguard to alert persons withholding funds pursuant to a stop notice that the funds are claimed (per the commenced stop notice action) and prevent premature release of the funds.

We are not the first court to come to this conclusion. Almost 50 years ago, the court in *Sunlight Electric Supply Company v. McKee* (1964) 226 Cal.App.2d 47 (*Sunlight*) similarly interpreted former Code of Civil Procedure section 1197.1, subdivision (b), the predecessor provision to the language at issue in section 3172. (See Stats. 1967 (Reg. Session), ch. 542, § 1, p. 1891.) The *Sunlight* court concluded that the notice of commencement of action requirement is not jurisdictional, but merely directory unless some detriment can be shown to have resulted from failure to file the notice within the five days. (*Sunlight*, *supra*, at p. 51.) It explained that "[t]he various steps and time requirements as to filings and services of notice are for the purpose of providing protective measures and a necessary warning to those to whom notice is to be given or upon whom service is to be made. If the time provisions are not complied with and as a consequence injury results to the entity or a legal claimant under the entity which service is required then it would stand to reason that a strict compliance with the requirement could properly be insisted upon by the servicee. But if no right of the servicee or any person or entity who could legally claim under the servicee is adversely affected by failure to comply with the time for service

33

requirement, then the requirement unless made so by specific mandate, is not a jurisdictional factor requiring the collapse of any remedy of which such notice or service forms a part." (*Sunlight*, *supra*, at p. 50.)

While Lender is correct that *Sunlight* is distinguishable because there a notice of commencement of action was filed 14 days late which led the trial court to find substantial compliance with the statute. (*Sunlight*, *supra*, 226 Cal.App.2d at p. 49.) In contrast, here, a notice was never filed. We believe this to be a distinction without a difference because the critical aspect of the *Sunlight* decision, with which we agree, is that the notice of commencement of action requirement is directory in the absence of prejudice. (*Id.* at p. 50.) Here, Lender does not allege it suffered any prejudice as a result of Division 8's failure to give it a notice of the commencement of the action. The evidence shows that Lender suffered no prejudice because it had no undisbursed construction funds left in its control when Division 8 served Lender its bonded stop notice. Thus, Division 8's failure to give Lender the notice of commencement of action after it served Lender its stop notice action resulted in no prejudice as it had no funds to release.

Finally, we reject Lender's assertion that *Sunlight* has been superseded by more recent strict compliance cases. The cases Lender relies on are inapposite because they address the section 3097 preliminary notice that is required prior to a contractor's performance of work on a project site. (*Harold L. James v. Five Points Ranch, Inc.* (1984) 158 Cal.App.3d 1, 3-7; *Shady Tree*, *supra*, 206 Cal.App.4th at pp. 135-139.) As discussed above, the unambiguous language of section 3097 indicates that the preliminary notice is a necessary prerequisite to the validity of the lien. (*Ante*, pt. III.A.)

DISPOSITION

The judgments in favor of respondents Brady, Division 8 and Brewer are affirmed. These respondents are to recover their costs on appeal.

The judgment in favor of Dynalectric is provisionally reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. If trial court finds in favor of Dynalectric on the existence of a factual excuse for not serving a preliminary notice on Lender, the judgment in favor of Dynalectric is affirmed and Dynalectric is to recover its costs on appeal. Alternatively, if trial court finds against Dynalectric on the existence of a factual excuse, the judgment in favor of Dynalectric is reversed and Lender is to recover its costs on appeal.

McINTYRE, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.