Filed 5/20/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BERTHE FELICITE KABRAN, as Successor in Interest, etc., Plaintiff and Respondent. v. SHARP MEMORIAL HOSPITAL, Defendant and Appellant, | D064133 (Super. Ct. No. 37-2010-00083678-CU-PO-CTL) |

APPEAL from an order of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Berman & Riedel and William Michael Berman; Kenneth M. Sigelman & Associates and Kenneth M. Sigelman, Penelope A. Phillips; Jon R. Williams for Plaintiff and Respondent.

Lotz, Doggett & Rawers and Jeffrey S. Doggett, Evan J. Topol for Defendant and Appellant.

Defendant and appellant Sharp Memorial Hospital dba Sharp Rehabilitation Center (Sharp) appeals from an order granting plaintiff and respondent's Berthe Felicite Kabran's motion for new trial following a special verdict on a cause of action for medical

malpractice in which the jury found Sharp was negligent in the care and treatment of plaintiff's predecessor, Dr. Eke Wokocha, but that the negligence was not a substantial factor in causing harm.[1]  Sharp contends the trial court acted in excess of its jurisdiction by granting a new trial because the motion was untimely, rendering the order void.  It further contends the court abused its discretion because the evidence proffered by plaintiff in support of the new trial motion was cumulative and consistent with defense expert trial testimony, and thus would not change the outcome of the trial.  We conclude that no jurisdictional defect appears in the court's new trial order and, as a result, Sharp may not raise its appellate contentions as to the motion's timeliness for the first time on appeal.  We further conclude the trial court did not manifestly abuse its discretion in assessing the new evidence—results of an autopsy conducted on Dr. Wokocha—and ruling on this record that plaintiff should be granted a new trial.  Accordingly, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Dr. Wokocha began developing weakness in his upper extremities.  By early 2009, he was experiencing progressive numbness, tingling, and weakness in his limbs, requiring him to use a wheelchair and walker.  Medical resonance imaging (MRI) conducted in late 2008 showed two distinct problems in the same location of his cervical spine: narrowing of the spinal canal (cervical stenosis) as well as a mass, later determined

---

[1]    Wokocha, a clinical psychologist, died after the jury returned its verdict, and the court substituted Kabran as his successor in interest.  We refer to plaintiff at times as Dr. Wokocha as do the parties on appeal.

to be a low-grade astrocytoma or tumor, on the back side of his spinal cord. Dr. Wokocha underwent spinal decompression surgery on January 7, 2009, and five days later was transferred to Sharp's rehabilitation center. After the evening of January 16, 2009, while at Sharp, he experienced a rapid decline in his condition resulting in complete quadriplegia.

Dr. Wokocha sued Sharp and others for negligence, and trial commenced in October 2012. The case was tried in part on the theory that while at Sharp Dr. Wokocha was mishandled by an occupational therapist during an attempted transfer from his bed to a shower commode chair, resulting in spinal shock and active bleeding (a hematoma), which caused his rapid deterioration to quadriplegia.[2] The parties presented conflicting expert testimony on the issues of negligence and causation, including based on the appearance of various MRIs taken of Dr. Wokocha's spine in January and February 2009, July 2011, and August 2012. The jury returned a special verdict finding Sharp was negligent in its care and treatment of Dr. Wokocha, but that the negligence was not a substantial factor in causing him harm.

On March 1, 2013, Kabran timely filed and served her notice of intention to move for a new trial on grounds, among others, of newly discovered evidence. Several days later, pursuant to the parties' stipulation, the court granted her an extension of time until Monday, April 1, 2013, which happened to be a court holiday, to file and serve her motion and supporting affidavits. On April 2, 2013, Kabran personally served her notice

_____

[2] Trial proceeded only against Sharp and John Jahan, M.D., one of Dr. Wokocha's treating physicians.

3

of motion and motion for new trial, along with two supporting declarations. She attempted to file the papers in the superior court that day, but ultimately, because the requisite filing fee was not paid, the court clerk cancelled the file stamp and did not process the motion.[3] On April 3, 2013, Kabran successfully applied ex parte for an order setting the new trial motion for hearing on April 12, 2013. The court ordered Sharp's opposition papers to be filed and served by noon on April 10, 2013. Kabran's new trial motion was eventually filed with the court on April 5, 2013, and her supporting declarations were filed on April 9, 2013.

Kabran's new trial motion asserted newly discovered evidence, namely, the results of an autopsy assertedly showing that the damage to Dr. Wokocha's spine was not the result of his tumor, and that "the [defense] witnesses who testified that the markedly abnormal area on MRI consisted entirely of a malignant astrocytoma, and/or that it was unrelated to trauma, were wrong." In support of the motion, Kabran submitted a declaration from Guerard Grice, M.D., who with another doctor had performed an autopsy, removed Dr. Wokocha's brain and spinal cord, and examined slides of tissue blocks taken from the cervical spinal cord. Kabran also submitted a declaration from her trial expert Jeffrey Gross, M.D., a neurological surgeon. Kabran argued that the tissue obtained from the autopsy from the "obliterated" portion of Dr. Wokocha's cervical spinal

---

[3]     We grant plaintiff's request to judicially notice the San Diego Superior Court's April 4, 2013 notice to filing party (Evid. Code, §§ 452, subd. (d) [allowing judicial notice of court records], 459, subd. (a)) as well as the fact that March 31, 2013, was Cesar Chavez day. (Evid. Code, § 451, subd. (f) [judicial notice of facts of generalized knowledge].)

4

cord, which was "in sufficient quantity to view grossly and microscopically so as to arrive at a definitive diagnosis," required a new trial. Sharp opposed the motion on the merits without raising any issue about its timeliness.[4]

After hearing arguments on the matter, the trial court granted the motion. It ruled there was a probability Dr. Grice's opinion would render a different result in a new trial, and the new evidence could not with reasonable diligence have been discovered and produced at trial.

Sharp filed this appeal.

DISCUSSION

I. *Timeliness of New Trial Motion*

Sharp has advanced several theories to contend that plaintiff's motion for new trial was untimely such that the trial court had no jurisdiction to consider it. It initially argued plaintiff's new trial motion and supporting affidavits were filed two days beyond the statutory time limit for filing the motion. Plaintiff responded by pointing out there was an intervening holiday so that the last day to file the motion and affidavits was April 2, 2013. Sharp has conceded that narrow point.

---

[4] Sharp objected to Dr. Grice's and Dr. Gross's conclusions as to causation on various grounds. In part, it argued Dr. Grice's conclusions lacked foundation and/or had an insufficient basis, and, as to his conclusion concerning the cause of the complete obliteration of Dr. Wokocha's mid-cervical spinal cord, was irrelevant. The court overruled Sharp's objections, stating, "The fact that plaintiff's newly discovered evidence may be challenged is not relevant to this motion." Sharp does not challenge on appeal the court's evidentiary ruling.

5

Sharp now contends the new trial motion was untimely because plaintiff did not pay the required filing fee until April 5, 2013, after the prescribed time limit for filing the motion. Responding to plaintiff's argument that Sharp forfeited timeliness contentions by failing to raise them in the trial court, Sharp argues the statutory time periods, including the periods in which to file opposing papers or affidavits in support of a new trial motion, are jurisdictional, and as a result it cannot have waived any objection to the untimely filing in the trial court.

As an additional ground to reverse the order granting a new trial, Sharp asserts in its opening and reply briefs that the trial court erred by shortening time for it to respond to the motion in violation of Code of Civil Procedure[5] section 659a, depriving it of the mandatory 10 days within which to either prepare counteraffidavits or obtain an extension of time to file them. Because the record does not contain a reporter's transcript of the April 3, 2013 ex parte hearing on the matter, Sharp has moved to produce additional "evidence" by way of its counsel's declaration as to what he said at that ex parte hearing.[6]

_____

[5]    Statutory references are to the Code of Civil Procedure unless otherwise specified.

[6]    Plaintiff's counsel responds to that motion by submitting his own declaration recounting what occurred at the hearing, contradicting Sharp's counsel's declaration. We deny Sharp's motion to produce new evidence under section 909, as the circumstances do not warrant our acting as a fact finder on matters occurring before the trial court. Generally speaking, we review the record as it was before the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) "[T]he 'circumstances under which an appellate court can receive new evidence after judgment, or order the trial court to do so, are very rare. For this court to take new evidence pursuant to statute (§ 909) . . . , the evidence normally must enable the Court of Appeal to affirm the [order], not lead to a reversal.' " (*J.J. v.*

6

A. *Applicable Law*

Section 659, governing new trial motions, provides in part:  "(a)  The party intending to move for a new trial shall file with the clerk and serve upon each adverse party a notice of his or her intention to move for a new trial, designating the grounds upon which the motion will be made and whether the same will be made upon affidavits or the minutes of the court, or both, either:  [¶]  (1) After the decision is rendered and before the entry of judgment.  [¶]  (2) Within 15 days of the date of mailing notice of entry of judgment by the clerk of the court pursuant to Section 664.5, or service upon him or her by any party of written notice of entry of judgment . . . ."

"[C]ompliance with the 15-day requirement of section 659 is jurisdictional," and absent compliance a trial court is "without power to entertain the motion."  (*Tri-County Elevator Co. v. Superior Court* (1982) 135 Cal.App.3d 271, 277.)  When a notice of intention to move for new trial is timely filed, it "shall be deemed to be a motion for a new trial on all the grounds stated in the notice."  (§ 659, subd. (b).)  Thus, " 'when the adverse party has been given due notice that . . . a motion (for a new trial) will be made and is fully apprised of the grounds to be urged the jurisdiction of the court is complete.' "

*County of San Diego* (2014) 223 Cal.App.4th 1214, 1227, fn. 4, quoting *Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090; see also *Monsan Homes, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830 ["The power to invoke [section 909] should be exercised sparingly, ordinarily only in order to affirm the lower court decision and terminate the litigation, and in very rare cases where the record or new evidence compels a reversal with directions to enter judgment for the appellant"].)  Whatever arguments counsel made before the court at the April 3, 2013 ex parte hearing are not evidence, much less new evidence.  (*In re Zeth S.*, at p. 414, fn. 6 [it is axiomatic that unsworn statements of counsel are not evidence].)  And in any event, even if we considered counsel's declarations submitted on appeal, their dispute over what they argued at the hearing fails to meet these stringent standards.

7

(*Nichols v. Hast* (1965) 62 Cal.2d 598, 600.)  "The purpose of notice under section 659 is to give the adverse party a reasonable opportunity to oppose a motion for a new trial on its merits."  (*Ibid.*)

Section 659a sets out time limits for filing accompanying affidavits and briefs supporting and opposing the notice of intention to move for new trial.[7]  It has been long held that the time limits for filing affidavits and counteraffidavits for new trial motions, though "strict" (*Clemens v. Regents of University of California* (1970) 8 Cal.App.3d 1, 21), are *not* jurisdictional.  (*Fredrics v. Paige* (1994) 29 Cal.App.4th 1642, 1648; *Wiley v. Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 188; *Clemens*, at p. 21; *Boynton v. McKales* (1956) 139 Cal.App.2d 777, 782; see *Smith v. Whittier* (1892) 95 Cal. 279, 295, called into doubt on other grounds by intervening statute in *Caira v. Offner* (2005) 126 Cal.App.4th 12, 35; *Spottiswood v. Weir* (1889) 80 Cal. 448, 451 [no error in allowing filing of counteraffidavits after time fixed by the code]; 8 Witkin, Cal. Procedure (5th ed. 2008) Attack on Judgment in Trial Court, § 65, p. 650 ["Affidavits or declarations [in connection with a new trial motion] filed too late may be disregarded. [Citations.]  On the other hand, the time limits are not jurisdictional.  The court may still consider an affidavit or declaration even if it is filed after the deadline"]; but see *Erikson*

_____

7       Section 659a  provides:  "Within 10 days of filing the notice, the moving party shall serve upon all other parties and file any brief and accompanying documents, including affidavits in support of the motion.  The other parties shall have 10 days after that service within which to serve upon the moving party and file any opposing briefs and accompanying documents, including counteraffidavits.  The moving party shall have five days after that service to file any reply brief and accompanying documents.  These deadlines may, for good cause shown by affidavit or by written stipulation of the parties, be extended by any judge for an additional period not to exceed 10 days."

8

*v. Weiner* (1996) 48 Cal.App.4th 1663, 1671-1672 (*Erikson*) [aggregate 30-day time period of section 659a for filing affidavits is mandatory and jurisdictional].) Thus, the court may, but need not, reject affidavits filed after those time limits.

"The power of a trial court to rule on a motion for a new trial expires 60 days after (1) the clerk mails the notice of entry of judgment, or (2) a party serves written notice of entry of judgment on the party moving for a new trial, whichever is earlier, or if no such notice is given, then 60 days after filing of the first notice of intent to move for a new trial. (§ 660.) If the motion for a new trial is not ruled upon within the 60-day time period, then 'the effect shall be a denial of the motion without further order of the court.' (§ 660.) The 60-day time limit provided in section 660 is jurisdictional. Consequently, an order granting a motion for a new trial beyond the relevant 60-day time period is void for lack of jurisdiction." (*Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 500; see *Mercer v. Perez* (1968) 68 Cal.2d 104, 123; *Siegal v. Superior Court* (1968) 68 Cal.2d 97, 101.)

B. *There is No Jurisdictional Defect in the Court's Order*

In this case, there is no dispute Kabran timely filed her notice of intention to move for new trial on March 1, 2013, and that the notice of intention set forth the grounds for a

9

new trial—newly discovered evidence—raised both below and now on appeal.[8]  Upon this filing, the trial court's "jurisdiction [was] complete," and Sharp was provided a reasonable opportunity to defend the motion, "for plaintiff['s] notice clearly stated that the motion would be made on the ground [of newly discovered evidence]."  (*Nichols v. Hast*, *supra*, 62 Cal.2d at p. 600.)  The trial court thereafter set dates for Sharp's opposition, and Sharp opposed the motion on the merits without raising any issue as to its ability to respond within the time limits ordered by the court or the timeliness of the motion in general.  The trial court did not address timeliness in its ruling, which was issued within the 60-day jurisdictional time-frame.  (§ 660.)

We need not address Kabran's argument that her accompanying papers were in fact timely filed on April 2, 2013, notwithstanding the clerk's cancellation of the file-stamp.  Even assuming arguendo she failed to meet section 659a's filing deadline for supporting affidavits, the trial court did not lose fundamental jurisdiction to act on plaintiff's motion by virtue of that circumstance, and the late filing did not render the court's order, or its acceptance of the late-filed papers, void.  Sharp's arguments to the contrary rely on cases addressing the untimely filing of a *notice of intention* to move for a new trial.  (See *Kientz v. Harris* (1953) 117 Cal.App.2d 787 [plaintiff's notice of intention to file a motion for new trial was untimely filed after court rejected it for the absence of a filing fee, requiring appellate court to dismiss appeal as untimely filed]; *Davis v. Hurgren* (1899) 125 Cal. 48 [affirming denial of motion for new trial where appellants' notice of

---

8    Though it is not included in the record, Sharp asserts its notice of entry of judgment was served on February 14, 2013.

10

intention was filed late due to absence of filing fee]; *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 936 [where notice of intention to move for new trial was not timely filed within 15 days from plaintiff's notice of entry of judgment, the trial court acted outside of its jurisdiction in granting the motion and the order was void]; *Ehrler v. Ehrler* (1981) 126 Cal.App.3d 147, 152-153 [order on new trial void where plaintiff's first notice of intention to move for new trial was filed prematurely, and second notice of intention was filed three days after the 15-day period from the mailing of the notice of entry of judgment; the trial court's act in hearing the motion and the parties' participation in the hearing did not confer jurisdiction on the court].) These cases are inapposite because there is no dispute Kabran's notice of intention to move for new trial in this case was filed within the 15-day jurisdictional deadline.

Sharp asserts that the jurisdictional rule for the notice of intention to move for a new trial "applies to the motion itself and supporting affidavits." But its authority cited for this proposition, *Douglas v. Janis*, *supra*, 43 Cal.App.3d at p. 936, did not involve any issue concerning the filing of the supporting motion and affidavits; it says nothing about the timeliness of such papers. Sharp also relies on *Erikson*, *supra*, 48 Cal.App.4th 1663 for the proposition that the 30-day outside time limit for filing affidavits in support of a new trial motion are jurisdictional, and that the court had no power to consider plaintiff's supporting affidavits.

In *Erikson*, the defendant, a medical doctor, moved for a new trial based in part on grounds of juror misconduct. (*Erikson*, *supra*, 48 Cal.App.4th at p. 1667.) The defendant thereafter obtained a 20-day extension of time in which to file his supporting

11

affidavits.  On the last day of the extension, he filed an affidavit of one juror, and 15 days later, he filed two additional affidavits, one from a juror named Gonzales, which the trial court ultimately accepted into evidence.  (*Id*. at pp. 1667, 1669.)  Nevertheless, the trial court denied the new trial motion.  (*Id*. at p. 1669.)

The Third District Court of Appeal affirmed the order, declining to consider the late-filed affidavits.  (*Erikson*, *supra*, 48 Cal.App.4th at p. 1666.)  On appeal, the plaintiff argued the time limits for filing affidavits was mandatory and that the Gonzales affidavit could not be considered.  (*Id*. at p. 1670.)  At the outset of its discussion of that issue, the *Erikson* court characterized plaintiff's claim as arguing "the aggregate 30-day time period provided in section 659a for filing affidavits in support of a new trial motion is mandatory (*also called jurisdictional*)."  (*Id*. at p. 1671, italics added.)  Focusing on the statute's use of the word "shall," the court held the period was mandatory and jurisdictional, reasoning also that section 659a specified a "consequence" for exceeding the time limit, namely the ability to obtain an additional extension of time by the court.  (*Id*. at p. 1672.)  It further reasoned that the time period was jurisdictional because any extension beyond the aggregate 30-day period of time would encroach upon the interests of the opposing party's allotted time to file counteraffidavits or the period for the court to deliberate on the motion.  (*Id*. at pp. 1672-1673.)  *Erikson* distinguished several cases stating that the time limits for filing affidavits are not jurisdictional.  (*Id*. at p. 1673.)

We are not persuaded by *Erikson*'s analysis and reasoning.  Generally, "requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary [legislative] intent is clearly

12

expressed." (*Edwards v. Steele* (1979) 25 Cal.3d 406, 410; see *People v. Allen* (2007) 42 Cal.4th 91, 102; *Brewer Corporation v. Point Center Financial, Inc.* (2014) 223 Cal.App.4th 831, 854.) Section 659a contains no clear legislative intent that its requirements are jurisdictional. The fact the deadlines are expressed in mandatory terms (i.e., "Within 10 days of filing the notice, the moving party *shall* serve . . .", italics added) is not determinative. "[I]t should not be assumed that every statute that uses [the term "shall"] is mandatory." (*People v. Lara* (2010) 48 Cal.4th 216, 227; *People v. Allen*, *supra*, 42 Cal.4th at p. 102 ["Neither the word 'may,' nor the word 'shall,' is dispositive"].) And, the new trial statutes contain other "mandatory" requirements that if unmet, do not result in a void order or an order in excess of the trial court's jurisdiction. (See *Nichols v. Hast*, *supra*, 62 Cal.2d at pp. 600-601 [trial court is not deprived of jurisdiction where a party fails to comply with section 659's requirement that a notice of intention to move for a new trial "shall" state whether the motion will be made upon affidavits or the minutes of the court].) Thus, *Erikson*'s focus on the use of "mandatory" language (*Erikson*, *supra*, 48 Cal.App.4th at p. 1672) does not compel its conclusion that the time limitations are jurisdictional.

Nor are we persuaded by *Erikson*'s interpretation of the statute and its purported consequences. According to the *Erikson* court, the prescribed "remedy" for noncompliance with the 10-day filing deadline is that the trial court may extend the time to file for an "additional period of not exceeding 20 days," and it reasoned that the court therefore "has no discretion to admit affidavits submitted thereafter." (*Erickson*, *supra*, 48 Cal.App.4th at p. 1672.) We do not read section 659a as either prescribing a remedy,

13

or specifying a consequence or penalty for a party's failure to meet the 10-day deadline specified therein (or the 30-day aggregate extended period) for filing affidavits. The statute merely gives the party the option to obtain an extension of that time. "The Legislature's failure to include a penalty or consequence for noncompliance with the statutory procedure . . . indicates that the requirement is directory rather than mandatory." (*People v. Lara*, *supra*, 48 Cal.4th at p. 217.)

We believe the *Erikson* court also confused the mandatory vs. directory dichotomy by equating a violation of a "mandatory" requirement with a lack of fundamental jurisdiction. " 'A typical misuse of the term "jurisdictional" is to treat it as synonymous with "mandatory." There are many time provisions, e.g., in procedural rules, which are not directory but mandatory; these are binding, and parties must comply with them to avoid default or other penalty. But failure to comply does not render the proceeding *void* . . . .' " (*Poster v. Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 274.) "A lack of jurisdiction in its fundamental or strict sense results in ' "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." [Citation.] On the other hand, a court may have jurisdiction in the strict sense but nevertheless lack " 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites." [Citation.] When a court fails to conduct itself in the manner prescribed, it is said to have acted in *excess* of jurisdiction.' " (*People v. Lara*, *supra*, 48 Cal.4th at p. 224.)

14

The *Erikson* court incorrectly concluded that the defendant's failure to meet the section 659a deadline deprived the trial court of any ability to accept the evidence.  We disagree with that conclusion.  Rather, in light of the general rule and the absence of clear legislative intent to the contrary, we conclude the period in which to file opposing papers, whether it be 10 or 30 days, is not jurisdictional in the fundamental sense, but is only jurisdictional in the sense that it deprives the court of power to act except in a particular manner, or to act without the occurrence of certain procedural prerequisites.  Accordingly, the court's acceptance of such evidence was *in excess* of its jurisdiction, but nevertheless within its fundamental jurisdiction.  (*People v. Lara*, *supra*, 48 Cal.App.4th at p. 224.)  Our conclusion is consistent with the weight of authority cited above (see part I (A), *ante*), holding that the section 659a deadlines are not jurisdictional.

C. *Sharp May Not Raise its Timeliness Challenges*

The foregoing analysis compels us to conclude that Sharp may not raise for the first time on appeal its arguments as to timeliness.  The distinction between an act that is beyond a court's jurisdiction in the fundamental sense and an act that is in excess of jurisdiction is important.  " '[A] claim based on a lack of [ ] fundamental jurisdiction[ ] may be raised for the first time on appeal. [Citation.]  "In contrast, an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time." ' "  (*People v. Lara*, *supra*, 48 Cal.4th at p. 225.)  "[A] claim that a trial court acted in excess of its jurisdiction, as

15

opposed to lacking fundamental jurisdiction to act, is subject to forfeiture by failing to preserve it in the trial court."  (*People v. Taylor* (2009) 174 Cal.App.4th 920, 937-938.)

Because Sharp did not challenge below either the timeliness of plaintiff's filed supporting papers and affidavits, or the period of time in which it was to file its opposition to plaintiff's motion, but rather opposed the motion on the merits, it may not for the first time on appeal challenge the court's power to consider plaintiff's new trial motion.  We therefore turn to Sharp's claims as to the correctness of the trial court's new trial order.

## II.  *New Trial Order*

### A.  *Legal Principles and Standard of Review*

"To entitle a party to have a new trial on [the ground of newly discovered evidence], 'it must appear . . . "1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits." ' "  (*People v. Williams* (1962) 57 Cal.2d 263, 270; see *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161; *Easom v. General Mortg. Co.* (1929) 101 Cal.App. 186, 194.)

"[T]he rule . . . that a new trial should not be granted where the evidence is merely cumulative, must be regarded (in this state) not as an independent rule, additional to those established by the provisions of section 657 of the code, but as a mere application of those rules, or, as it has been expressed, as 'a corollary of the requirement that the newly

16

discovered evidence must be such as to render a different result probable on a retrial of the case.' [Citation.] For . . . 'it is evident that new evidence, although cumulative, might be of so overwhelming a character as to render a different result certain' (or probable); and in such case under the express provisions of the code a new trial should be granted. The rule should therefore be construed as simply holding that cumulative evidence is insufficient 'unless it is clear such evidence would change the result.' [Citation.] Hence, 'a new trial should not be refused merely because the evidence is cumulative in a case where the cumulation is sufficiently strong to render a different result probable.' " (*Oberlander v. Fixen & Co.* (1900) 129 Cal. 690, 691-692.) Accordingly, "[e]ven where [evidence is cumulative], the court is not thereby precluded granting a new trial . . . . The question before the trial court, even where the newly discovered evidence is simply cumulative, is whether if such evidence had been presented on the trial of the cause it would probably have produced a different result. The determination of that question is peculiarly within the province of the trial court. It is a matter addressed wholly to its discretion and as a general proposition whether its ruling is favorable or unfavorable on a motion for new trial based on newly discovered evidence which appears to be merely cumulative, that discretion will not be reviewed except for manifest abuse." (*Cahill v. E.B. & A.L. Stone Company* (1914) 167 Cal. 126, 135; see also *Brannock v. Bromley* (1939) 30 Cal.App.2d 516, 519-520; *People v. Lakenan* (1923) 61 Cal.App. 368, 373.)

Under the applicable abuse of discretion standard, the court's order granting a new trial must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the moving party on the theory relied upon

17

by the trial court.  (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412; *People v. Williams*, *supra*, 57 Cal.2d at p. 270; *Slemons v. Paterson* (1939) 14 Cal.2d 612, 615-616.)[9]  "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside."  (*Jimenez v. Sears, Robuck & Co.* (1971) 4 Cal.3d 379, 387; *Candido v. Huitt* (1984) 151 Cal.App.3d 918, 922-923.)

B.  *New Trial Evidence*

Dr. Grice's new trial declaration recounted his autopsy findings from having examined slides of tissue blocks taken from Dr. Wokocha's cervical spinal cord.  According to Dr. Grice, plaintiff's mid-cervical spinal cord was "markedly abnormal" with no remaining normal spinal cord at the abnormal area; the normal cord tissue had been replaced by "a disorganized neural proliferation accompanied by fibrosis—consistent with 'traumatic' neuroma."  He stated that a traumatic neuroma "occurs in the

---

[9]     We observe that Sharp relies on the principle that motions for new trial on grounds of newly discovered evidence "are looked upon with disfavor . . . ."  (*People v. Williams*, *supra*, 57 Cal.2d at p. 270; *Shivers v. Palmer* (1943) 59 Cal.App.2d 572, 576.)  But "[d]istrust or disfavor of the motion does not mean 'that when the trial court has exercised its discretion and granted a new trial that such action is looked upon with either distrust or disfavor.  In fact, it has been said that one of the most prolific causes of miscarriages of justice is the reluctance of trial judges to exercise the discretion with which they are clothed to grant a new trial when the circumstances show that justice would be thereby served.  This by reason of the curtailed power of appellate courts to disturb the discretion of the trial court once it is exercised in such matters.  It is recognized that despite the exercise of diligent effort, cases will sometimes occur where, after trial, new evidence most material to the issues and which would probably have produced a different result is discovered.  It is for such cases that the remedy of a motion for a new trial on the ground of newly discovered evidence has been given.' "  (*People v. Love* (1959) 51 Cal.2d 751, 758; see also *People v. Minnick* (1989) 214 Cal.App.3d 1478, 1481.)

18

setting of trauma (e.g. blunt force injury)" and was not a neoplasm.[10] Dr. Grice stated: "There was no evidence whatsoever of a neoplasm (including an astrocytoma) in any part of the obliterated mid-cervical spinal cord segment. However, peripeheral to this mid-cervical area, where the spinal cord displayed its normal microscopic architecture, there was evidence of an infiltrating astrocytoma, not forming a tumorous mass per se, but composed of individual neoplastic astrocytes infiltrating the normal cord parencyma." It was Dr. Grice's opinion that the obliteration of plaintiff's spinal cord was "not likely due primarily to the presence of an astrocytic tumor," but rather "to a reasonable medical probability, that the completely obliterated mid-cervical spinal cord was replaced by a traumatic neuroma—in this instance caused by trauma."

In his supporting new trial declaration, Dr. Gross averred that all of the defense causation experts testified that plaintiff's neurological deterioration was caused by growth of the cervical spinal cord tumor. Dr. Gross recounted his opinions at trial, stating: "I testified in deposition and at trial that the acute neurologic deterioration that Dr. Wokocha suffered late on January 16, 2009, and early on January 17, 2009, was caused by an acute traumatic injury to Dr. Wokocha's cervical spinal cord on the morning of January 16, 2009, and that the trauma responsible for this injury was to a reasonable medical probability a whiplash-type (acceleration-deceleration) injury that occurred when Dr. Wokocha was returned to the bed following an attempted transfer to a shower commode chair . . . . The acceleration-deceleration injury resulted in the development of

_____

10    Plaintiff's trial expert neuropathologist, Dr. Saleir Gultekin, testified that a "neoplastic process" would mean some sort of cancer.

19

an epidural hematoma which, by the early morning of January 16, 2009, had rendered Dr. Wokocha a near-total quadriplegic by compressing his spinal cord. It was my opinion to a reasonable medical probability that the acute neurological deterioration that occurred late on January 16, 2009, and early on January 17, 2009, was not related to the astrocytoma. It was also my opinion to a reasonable medical probability that, had the acute injury . . . caused by the transfer incident not occurred, Dr. Wokocha to a reasonable medical probability, would not have deteriorated to near-total quadriplegia, would have successfully completed his course of rehabilitation, and would have been able to return to a largely independent life that included resuming work as a clinical psychologist." Dr. Gross stated that Dr. Grice's description correlated with what he saw on MRI studies, and that because plaintiff did not have treatment of any kind for the astrocytoma, the absence of tumor cells from the obliterated area of his spinal cord "elevates from a reasonable medical probability to a medical certainty my degree of confidence that Dr. Wokocha's neurological deterioration to near total quadriplegia on late January 16, 2009, and early January 17, 2009[,] was not in any way related to his astrocytoma, and was caused by trauma related to the transfer incident." Dr. Gross averred, "We now know with complete medical certainty that the tumor was not a causative factor . . . ."

In opposition, Sharp argued the autopsy findings were consistent with its defense experts' trial opinions, and thus the new evidence was merely cumulative. It argued the evidence could have been discovered with reasonable diligence before trial by performing a further biopsy of Dr. Wokocha's spinal cord. It maintained none of the

20

evidence would change the result of the trial, in which the jury rejected plaintiff's causation theory. Sharp presented a declaration from its trial expert Douglas Miller, M.D., a neuropathologist, who averred, in part, that nothing in the autopsy slides would change his trial opinion that, "with a reasonable degree of medical probability, Dr. Wokocha's demise was due to the presence of a cervical cord astrocytoma, and not due to spinal cord necrosis from pressure from an epidural hematoma which was supposed to have resulted from an alleged drop incident."

C. *Analysis*

Sharp contends the trial court abused its discretion in granting a new trial because plaintiff's assertedly new evidence was merely cumulative of the trial evidence. Specifically, Sharp points out that both Dr. Grice and Dr. Gross in their declarations conclude that there was abnormal fibrous tissue in plaintiff's mid-cervical spine replacing the spinal cord that was consistent with trauma. It argues, "[Dr. Grice's and Dr. Gross's] opinions . . . as is evident by Dr. Gross' declaration alone, are entirely consistent and 'substantially the same' as the testimony offered by plaintiff's experts at trial." (Some capitalization omitted.) Sharp compares the circumstances to *Evans v. Celotex Corporation* (1987) 194 Cal.App.3d 741 and *Smith v. Exxon Mobile Oil Corporation* (2007) 153 Cal.App.4th 1407, in which courts addressed a party's ability to bring a new lawsuit against the same defendant based on assertedly new facts or evidence. But these cases involved not motions for new trial on a claim of newly discovered evidence, but application of the doctrine of collateral estoppel, in which the court looks merely to whether identical issues were decided in successive actions (*Vandenberg v. Superior*

21

*Court* (1999) 21 Cal.4th 815, 828), not whether a different result in the same trial would be reached upon new and different evidence. (*Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 896 [former judgment is collateral estoppel on issues that are raised even though some factual matters that could have been presented were not].) These authorities are inapposite.[11]

Sharp further maintains that Kabran admitted below the cumulative nature of the new evidence when she argued it showed his trial expert, Dr. Gross, "had it right" and the cumulative aspect of the evidence is evident from the court's ruling that the autopsy findings were supportive of plaintiff's position on causation. But as we have explained,

---

[11]    In *Evans v. Celotex Corp.*, *supra*, 194 Cal.App.3d 741, a deceased man's family sought to sue a defendant for wrongful death after the defendant had successfully defended a suit brought by the man during his lifetime. In part, the family argued collateral estoppel could not be applied where "new facts have occurred since the judgment" and an autopsy permitted a "better diagnostic evaluation" showing asbestosis was the proximate cause of his death. (*Id*. at p. 747.) The court concluded that the additional evidence did not change the legal relationship of the deceased and the defendant and there were no new events for conditions that "caused a different legal doctrine to be applied" so as to prevent application of collateral estoppel. (*Id*. at p. 748.) "An exception to collateral estoppel cannot be grounded on the alleged discovery of more persuasive evidence. Otherwise, there would be no end to litigation." (*Ibid*.) *Smith* relied on an equitable component to collateral estoppel in which a prior trial does not provide "a full and fair opportunity to present a defense." (*Smith v. ExxonMobil Corp.*, *supra*, 153 Cal.App.4th at p. 1420.) "[E]ven where the technical requirements [of collateral estoppel] are all met, the doctrine is to be applied '*only* where such application comports with fairness and sound public policy.' " (*Id*. at p. 1414.) In *Smith*, plaintiffs sought to use collateral estoppel offensively to preclude a defendant from raising defenses to liability in a new lawsuit. Its defense was supported by testimony of a defense expert who was unable to testify in the prior trial due to the sudden death of his daughter while trial was in progress. In those "unusual and compelling circumstances," in which the prior trial did not provide a full and fair opportunity to present a defense, the appellate court concluded it would be unfair to apply collateral estoppel. (*Id.* at p. 1420.)

22

the fact the evidence is cumulative does not require denial of the new trial motion; it is for the trial court to assess the evidence to determine whether the cumulation is sufficiently strong as to render a different result probable. (*Oberlander v. Fixen & Co.*, *supra*, 129 Cal. at pp. 691-692; *Cahill v. E.B. & A.L. Stone Company*, *supra*, 167 Cal. at p. 135; *Brannock v. Bromley*, *supra*, 30 Cal.App.2d at pp. 519-520.)

Sharp additionally argues that the proffered new evidence does not contradict the testimony of defense experts as plaintiff urged below. It argues its experts at trial agreed that the abnormal area of Dr. Wokocha's spine consisted of both tumor and cysts; that there was a "cystic aspect of the 'tumor' " and tumor cells were integrated along the cyst walls.

As Kabran points out, the trial evidence demonstrates that while an intraoperative biopsy was performed on the mass in Dr. Wokocha's spinal cord during the January 7, 2009 decompression surgery, only "minute" fragments of tissue were obtained, and a definitive diagnosis of the mass was difficult. Plaintiff's expert neuropathologist, Dr. Gultekin, evaluated the material obtained during that biopsy. He explained that in his experience with spinal cord tumors, such a "very, very small amount of tissue" was typically all that could be obtained; and that in Dr. Wokocha's case, the pathologist to whom the sample was sent during surgery could not reach a certain diagnosis so she sent the slides to a world renowned expert at the Mayo Clinic, who described it as a "frustratingly difficult diagnostic problem." Dr. Gultekin had chosen a representative photograph of a slide from that biopsy and stated that overall it "doesn't seem to be a diagnostically useful specimen" and "not really very informative per se." He denied

23

seeing anything on any portion of the slides he reviewed that permitted him to identify a tumor cell, and he testified that if he were to give a diagnosis as a neuropathologist clinician, he could not find definitive evidence of tumor present. His overall conclusion based on the slides and other materials he had reviewed was that the lesion in plaintiff's spine "may not actually be a tumor. I don't see any good evidence that this is an astrocytoma in any of these elements that we have described." Though Dr. Gultekin recognized a possibility of an astrocytoma, he testified it would have to be "low grade at best . . . "

Dr. Gross, plaintiff's causation expert, testified at trial that he did not disagree that plaintiff's biopsy showed a low grade astrocytoma. However, according to Dr. Gross, plaintiff's February 2009 MRI showed a fluid filled cyst, also called a syrinx or cystic myelomalacia, in the middle of plaintiff's spinal cord, which was the result of trauma to the cord, namely, compressive pressure from a hematoma that occurred on January 16, 2009. Though he agreed astrocytomas could cause a syrinx, Dr. Gross testified the cyst or syrinx was not tumor-related, nor was it related to plaintiff's earlier January 7, 2009 surgery at Scripps. Dr. Wokocha's August 2012 MRI did not change Dr. Gross's conclusion that there was no relationship between the tumor and the cyst; there was no significant progression of the astrocytoma from October 2008 to August 2012. Dr. Gultekin similarly testified the syrinx shown in Dr. Wokocha's February 2009 MRI could form "from trauma, from tumor, or from a hematoma," and that trauma could result from surgery or the chronic stenosis (narrowing).

24

The defense experts' conclusions were decidedly conflicting. Sharp's neurosurgery expert, Dr. Duncan McBride, ultimately testified that a February 19, 2009 image of Dr. Wokocha's spinal cord was inconsistent with a traumatically caused syrinx and by July 2009 showed "complete utter invasion and overgrowth of tumor with the spinal cord just destroyed in there." He testified that Dr. Wokocha's August 2012 film showed a large tumor, not any cystic change due to prior trauma. He opined that had nothing else happened to Dr. Wokocha, he would have been a quadriplegic simply due to the growth or expansion of the tumor. David Allen Reardon, Sharp's neurooncologist, testified that Dr. Wokocha had a large lesion with an area of enhancement on his cervical spinal cord, characteristic of an aggressive tumor.

Sharp's causation expert, neuropathologist Douglas Miller, testified he had "zero doubt" that the January 7, 2009 biopsy showed astrocytoma, and that without treatment for that tumor, Dr. Wokocha would be a complete quadriplegic even without any intervening event or development of a hematoma. He reviewed Dr. Wokocha's February 2009 MRI and testified that the abnormal area was "absolutely not" a syrinx or myelomalacia. He testified he had no doubt based on all of the MRIs that plaintiff had a low grade and expanding astrocytoma. Thus, as Sharp itself points out, its experts reached ultimate opinions, contradicting plaintiff's experts, that the tumor was the cause of plaintiff's quadriplegia.

Dr. Wokocha's autopsy enabled a neuropathologist to examine tissue blocks of the obliterated portion of his spinal cord, which was now removed and fixed in a preservative, and resulted in a materially different type of sample allowing Dr. Grice to

25

specify what had replaced the normal spinal cord tissue, and Dr. Gross to testify to a medical certainty about the cause of Dr. Wokocha's total quadriplegia. Indeed, Sharp's own expert, Dr. Miller, generally confirmed the importance of autopsy findings when he stated: "[O]bviously if Dr. Wokocha were to expire and have an autopsy, and I was given the opportunity to look at what was in his cervical cord under the microscope, if I can't find any tumor there, I would change my opinion, but short of that, I don't see any other means of providing evidence that I'm wrong . . . ." Sharp argues that biopsy slides already existed and were reviewed by experts, but it is apparent from plaintiff's expert neuropathologist's testimony that the samples were so minute as to render diagnosis difficult.[12] Where it is doubtful that evidence is cumulative, it becomes a matter of discretion, and unless there is a manifest abuse of it, the reviewing court will not interfere. (*Brannock v. Bromley*, *supra*, 30 Cal.App.2d at p. 521.) And, we give great weight to the court's conclusion that the new evidence made it reasonably probable that plaintiff would have obtained a more favorable result. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 728.) "The trial court determines what evidence to believe, and the evidence submitted by the prevailing party, along with its reasonable inferences, is deemed established." (*Ibid*.)

---

[12]   Sharp maintains in passing that because this biopsy had been performed, it can be argued that the information stemming from plaintiff's autopsy was "available at the time of trial" and that experts were permitted to offer opinions and theories on the make-up of the abnormal spinal tissue from the original biopsy. But the trial judge reasonably concluded that a biopsy performed as a result of an autopsy would be materially different from the minute amounts of tissue taken in January 2009.

Given the limited scope of our review on the trial court's grant of a new trial (*Candido v. Huitt*, *supra*, 151 Cal.App.3d at p. 923), we affirm.  We cannot say under all of the circumstances, given the vastly conflicting medical expert opinions presented at trial, that the trial court, who listened to all of the trial evidence, manifestly or unmistakably abused its wide discretion as to compel us to reverse its decision.

Finally, Sharp contends the new evidence does not make a different judgment probable on retrial because it does not advance plaintiff's trial theory that the alleged drop incident caused a hematoma that compressed plaintiff's spine and caused plaintiff's injury, and thus does not link the incident to plaintiff's injury.  It recounts the expert testimony relating to the age of a hematoma removed from plaintiff's spine on January 17, 2009, the day after the alleged drop incident, and argues that four defense experts agreed it was an old hematoma that predated the alleged drop incident.  It argues the weight of the evidence was that the hematoma was not what compressed plaintiff's cervical spine, and points to plaintiff's own neurooncology expert who could not link the hematoma to plaintiff's traumatic injury.[13]  The point of plaintiff's motion for new trial

---

[13]    This theory was not presented in Sharp's opposition to the new trial motion, but was argued by counsel during oral argument.  He argued that plaintiff's theory was that the blunt force trauma was the development of the hematoma, but the evidence showed the hematoma developed at Scripps Clinic, not Sharp.  Counsel argued "the jury can decide causation on that fact alone" and thus did not need to decide what was inside the lesion on plaintiff's spine.  The court responded to this argument in part by saying, ". . . I sat through the trial.  [The jury] probably found that something happened that shouldn't have.  . . .  He was dropped.  Something happened.  They didn't use the right commode.  Anyway, something happened.  [¶]  And then the question was what caused him to become a flaccid quad.  And that's where it got very heated, very complicated.  There were many, many witnesses.  And there was evidence he didn't have an astrocytoma;

27

was not to present evidence in strict keeping with its theory at trial, but to present new evidence that would cause a jury to reach a different conclusion as to causation. New evidence that a neuroma caused by trauma replaced plaintiff's normal spinal cord does not prevent a jury from reaching a conclusion that a drop caused plaintiff's quadriplegia notwithstanding the evidence of hematoma, which was highly contested at trial.

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

---

there's evidence that he did. There's evidence that he should be dead by now; there's evidence that he's going to live another 50 years. I mean it was very, very—there was no real agreement on anything. And then we get to the slides, and that was even more complicated with MRIs and stains. I mean it was beyond the capability of most people—nonmedical people to comprehend, I think."